**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| K.M., a minor, by and through, Felicia Sanders, as Natural Guardian and Next Friend,<br><br>　　*Plaintiff*<br><br>　　*v.*<br><br>Meta Platforms, Inc. (f/k/a Facebook, Inc., a Delaware corporation); Facebook Holding, LLC; Facebook Payments, Inc; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc; Internet Research Agency, LLC (a/k/a Mediasintez LLC a/k/a Glavset LLC a/k/a Mixinfo LLC A/K/A Azimut LLC a/k/a Novinfo LLC); Concord Management and Consulting LLC; Concord Catering; Yevgeniy Viktorovich Prigozhin; Alphabet, Inc.; Google, LLC; YouTube, LLC,<br><br>　　*Defendants* | No.　2:23-cv-1370-RMG<br><br><br><br>**Complaint**<br><br><br><br>*Jury Trial Demanded* |

Submitted:　　April 5, 2023

s/ François M. Blaudeau
François M. Blaudeau (ASB-7722-D32F)
Evan T. Rosemore (ASB-3760-N10B)
Marc J. Mandich (ASB-9346-H48E)
SOUTHERN MED LAW
2762 B M Montgomery St, Suite 101
Homewood, AL 35209
Office: 205.564.2741
Fax: 205.649.6386
francois@southernmedlaw.com
evan@southernmedlaw.com
marc@southernmedlaw.com

*Lead Counsel for the Plaintiff*
*(pro hac vice applications to be filed)*

s/T. Ryan Langley
Ryan Langley (10047)
Hodge & Langley Law Firm, P.C.
229 Magnolia St.
Spartanburg, SC 29306
rlangley@hodgelawfirm.com

*Co-Counsel for the Plaintiff*

s/Gerald Malloy
Gerald Malloy
Malloy Law Firm
108 Cargill Way
Hartsville, SC 29550
gmalloy@bellsouth.net

*Co-Counsel for the Plaintiff*

1

s/Andrew J. Savage III
Andrew J. Savage III (3734)
SAVAGE LAW FIRM
15 Prioleau Street
Charleston, SC 29401
Telephone: (843) 720-7470
Andy@savlaw.com

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 4

PARTIES ........................................................................................................................... 15

    The Meta Defendants ................................................................................................... 15

    The Google Defendants ................................................................................................ 17

    The Russian Defendants ............................................................................................... 18

JURISDICTION AND VENUE .......................................................................................... 21

FACTUAL ALLEGATIONS .............................................................................................. 23

    A.      Youtube's defective design and inherent, intentional propensity to promote and foster extremism and racial animus. .............................................................................. 49

    B.      Facebook's Defective Design and Architecture .................................................. 53

          1.   Facebook prioritizes hate speech and misinformation to increase user engagement. ........................................................................................................... 55

          2.   Facebook promotes extremist group content and weaponizes it against users. 65

          3.   Exploitation by extremists and Facebook's success in radicalizing its users. 66

          4.   The Russian Defendants Use of Facebook .................................................... 69

          5.   Dylann Roof's radicalization on Google/Youtube and Facebook. ............... 74

    C.      The Damage and Harm to Plaintiff Minor Person K.M. ...................................... 80

CAUSES OF ACTION ....................................................................................................... 84

    COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT ................................ 84

    COUNT II – NEGLIGENCE – DESIGN ............................................................................ 87

    COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ....................... 89

    COUNT IV – CIVIL CONSPIRACY IN VIOLATION OF THE KU KLUX KLAN ACT . 90

TIMELINESS & TOLLING ............................................................................................... 94

PRAYER FOR RELIEF ..................................................................................................... 94

Felicia Sanders (hereinafter by name or "Plaintiff"), as Grandparent, Natural Guardian, and Next Friend of K.M. (a minor), complaining of the Defendants,[1] alleges as follows:

## INTRODUCTION

1.      On the evening of June 17, 2015, Felicia Sanders, accompanied by her son Tywanza Sanders and her granddaughter K.M., attended Bible Study at the Mother Emanuel AME Church in Charleston under the guidance of the Reverend Clementa Pinckney. Just shortly after 8:15pm that evening a young man from a different part of the state named Dylann Roof entered the Church through the basement entrance and joined a bible study group of twelve members that was in session in the Fellowship Hall. The Rev. Pinckney was a state senator and a highly respected preacher and orator and he welcomed the young stranger by pulling out a chair for him. As the study concluded, Roof stood up, pulled a handgun, and assassinated the Rev. Pinckney, shooting him three times at point blank range. Roof went on to shoot, in cold blood, eight other parishioners carrying out one of the most vicious hate crimes in modern American history.

2.      Roof shot and killed nine people: the Rev. Pinckney and eight parishioners: the Rev. Sharonda Coleman-Singleton, the Rev. DePayne Middleton-Doctor, the Rev. Daniel Simmons, Cynthia Hurd, Susie Jackson, Myra Thompson, Ethel Lance, and Tywanza Sanders. Each of them suffered a horrific, violent death.

3.      Roof went table to table shooting the unarmed, innocent Bible Study participants. When he arrived at the table #3 where Felicia Sanders sat with her granddaughter and her son,

---

[1] The **"Defendants"** is the term utilized herein for allegations directed at all Defendants named. The Defendants are grouped for purposes of other individual allegations herein, in two different ways. First, the internet defendants (including both the Google and Meta entities) are referred to, collectively, as the **"Social Media Defendants"**; the Russian entities named are referred to, collectively, as the **"Russian Defendants."** Second, the "Social Media Defendants" are further individually referenced, where necessary, as the **"Meta Defendants"** (Meta, Facebook, Instagram, Siculus, etc.) and the **"Google Defendants"** (Alphabet, Google and YouTube), respectively.

Tywanza, and her Aunt Susie, Felicia pushed her granddaughter to the floor and used her body to shield the child from bullets flying through the air. She held her hand so tightly over K.M.'s mouth to keep her from being heard she thought she might suffocate her. Tywanza tried to reason with Roof and when that failed, he stood up and placed his body in front of Roof's gun barrel to shield his mother and niece.

4.      Tywanza was shot several times and fell to the ground mortally wounded. He died with his hand outstretched toward his Aunt Susie who had also been mortally wounded. Felicia was forced to play dead lying in her dying son's blood. Incredibly, neither Felicia nor her granddaughter were struck by any of the bullets.   Felicia and her granddaughter stayed frozen to the floor as Roof moved on past them to the next table.

5.      Minor Child K.M. watched her uncle die in front of her and lived through the terror and panic of the horrific incident. Following this traumatic event, she suffered significant Post-Traumatic Stress Disorder (PTSD) and required long-term hospitalization and treatment. She files this lawsuit to seek accountability from those most responsible for placing Roof in that Church. These very unfortunate Churchgoers, including Tywanza Sanders, were murdered, in a place of sanctuary no less, merely because of the color of their skin. There is no question this massacre was the result of racial animus that occupied the mind of Roof. The questions for our purposes here are *how* and *why* this extreme racial animus came to occupy his young, impressionable mind.

6.      Extensive study of Roof has shown his formative years and familial environment did not include instruction as to white supremacist ideology. Rather, research shows he was radicalized online by white supremacist propaganda directed to him by the Defendants.  His father, Benn Roof, asked about his son's racist mindset was quoted: "I don't know what happened, I just

know that the boy wasn't raised that way." Roof's Uncle, Carson Cowles, confirmed this and there has never been any dispute or evidence to the contrary.

7.     Through repetitious exposure to online white supremacist propaganda, Roof learned how to hate and grew obsessed with "white replacement theory." He was groomed and aided by the Defendants, who conspired together to target individuals like Roof who would be susceptible to online engagement with the kind of white supremacist propaganda and ideology that leads to offline violence, including the white replacement theory. Roof ultimately concluded he needed to trigger a racially motivated civil war.

8.     By design, Roof was shown so much white supremacist propaganda he believed the heinous act he ultimately committed at Mother Emanual was necessary to spark a race war and save the white race. Roof's online radicalization led directly to unspeakable offline violence. And it was all entirely foreseeable to Defendants.

9.     The story of how this happened begins years earlier and thousands of miles away in a hostile foreign country. Hostile foreign actors were looking for new opportunities to cause civil unrest in the U.S. *via* social media and an increasingly influential online environment. Indeed, highly sophisticated foreign actors deliberately caused civil unrest in the U.S. by exploiting defective algorithms in social media platforms, that, combined with negligent social media product design, created an efficient form of influence over social media users that inherently drives an ever more extreme and emotional response in the individual, often leading to extreme (and sometimes violent) offline action. That is the story of Roof (and so many others).

10.     The Russian Defendants had purposeful malicious intent to carry out this clandestine operation to incite racial hate and racial violence in the United States. They were aided by the Social Media Defendants' defective products, which they used, unrestricted by the Social

Media Defendants, in a new way of communicating and influencing individuals (at scale) with racist narratives and misinformation. The repercussions of this attack on the social fabric of the U.S. were dramatic and have caused unimaginable pain and suffering. The ability to influence the minds of hundreds of millions of American citizens through social media platforms and websites was an opportunity that was not available historically.

11.    On June 17, 2015, Roof squeezed the trigger on the handgun that murdered those nine innocent churchgoers during a routine Wednesday night bible study. But we now know online radicalization was a substantial factor in influencing Roof to carry out that horrendous crime. This was a premeditated political attack that was launched on the social fabric of the United States by corporations and individuals closely linked to a hostile Russian government, which was seeking to gain some geopolitical advantage by inciting a race war in the U.S. Their weapon of choice was social media infiltration and exploitation, and their strategy was very successful because of a social media industry, led by the Social Media Defendants, that had complete disregard for the health and safety of their users. The Social Media Defendants exposed their users, including Roof, to defective products that caused psychological injury and substantially increased the risk that online radicalization would cause offline violence.

12.    The Russian Internet Research Agency along with the CONCORD entities and PRIGOZHIN (the "Russian Defendants", *see* fn. 1, *supra*) worked toward a common strategic goal to sow division among the racial and ethnic groups in the U.S.; to cause discord and upset the U.S. political system; and to undermine faith in U.S. democratic institutions, including by inflaming social and political polarization. Their intent was to fan the flames of white supremacy and violate the civil rights of African Americans. The scheme was elaborate and included the promotion of racial hate and racism through fictitious U.S. personas on social media platforms and other

7

Internet-based media. Members of the conspiracy posed as U.S. persons, operating fictitious social media personas, pages, and groups, designed for purposes of attracting U.S. audiences and causing racial polarization and enhancing hate between the races. The Russian Defendants' goal was to "destabilize the internal situation in the U.S." by deliberately inflaming racial tensions through spreading false rumors and incendiary stories to and/or about African Americans *via* social media. The Russian Defendants were intent on splitting America along racial lines and eroding trust in our institutions. The Russian Defendants specifically targeted seven southern states including South Carolina. It was an attempt to create racial chaos in the U.S. *via* social media infiltration.

13.    Social media platforms like Facebook, Instagram and YouTube are still largely unregulated and, the largest players in the market are voraciously profit-driven corporations and private enterprises. The Meta Defendants had to make decisions along the way as Facebook grew to become the dominant social media platform; likewise, the Google Defendants had to make decisions along the way as its industry-leading search engine (and, later, its industry-leading video-sharing platform, YouTube) grew to dominate their own respective spheres.  Besides what the Social Media Defendants are now well known for (their unyielding "buy or kill" strategies towards any competition), their profit-before-safety growth strategy also involved weighing what was "best practices" for the general wellbeing of their users and society versus the need and desire to positively drive their profit margins. Safety was spurned in favor of growth and market share. Decisions were made at the highest executive level within the Social Media Defendants to develop products that would maximize user engagement, encouraging and promoting time spent on the platforms, without regard for the mental health and wellbeing of the users.

14.    The simple fact is the Social Media Defendants' business models (where the advertisers are the customers and the users are the product) depend on keeping people glued to

their screens so these companies can sell advertisements. And provocative content best accomplishes this goal. Once the Social Media Defendants learned this through their own internal research, they exploited it heavily and pushed out or ignored anyone along the way who raised moral or ethical questions. Those decisions should not be without consequence.

15.     Behavioral scientists have now ascertained the interaction of young impressionable adolescents and young adults with the Social Media Defendants' products causes online radicalization to occur. The online radicalization of Roof is well documented and directly led to his decision to carry out offline mass violence. Roof even confessed he committed the shooting in hopes of igniting a race war.

16.     The first and perhaps most critical step was Roof's now-infamous initial Google search for "black on white crime" following the tragedy of Trayvon Martin that led him to resources – *prioritized by Google* when generating search "hits" *for him* – that were intended to stoke/amplify (in this young, white, southern Googler) fear and resentment of African Americans. Instead of receiving balanced information from trustable sources, Roof was led down the rabbit hole by Google to the "Council of Conservative Citizens" page and then, in turn, down the line to other white supremacist grooming sites (e.g., the "Daily Stormer" and "Stormfront"). Upon information and belief, Roof was led to similar information/videos on YouTube, given Google's growing knowledge this type of content was keeping Roof engaged on their platforms.

17.     Roof also had a Facebook page where, upon information and belief, he received further confirmation and affirmation of the worldview the Google Defendants first planted the seeds of from the Meta Defendants (by their own design and through their own algorithmic knowledge of what would most likely cause increased engagement by Roof with their product). Also likely through the aid and design of the Meta Defendants' algorithms, which direct users to

9

"connections" (Facebook "groups" and other individual users) it predicts the user will engage with, Roof further connected with other like-minded white supremacists on Facebook. And just three weeks prior to the racially motivated attack, the 21-year-old changed his Facebook profile photo to one featuring him in a wooded scene wearing a jacket with multiple patches, including ones with neo-Nazi references and one which appears to be the flag of Apartheid-era South Africa/Rhodesia along with neo-Nazi references. Through the Defendants collective actions and by their design, Roof was gradually moved from a curious internet user, to a racially indoctrinated and angry internet user, and ultimately to a violent, racist mass-murderer.

18.    The Meta Defendants operate the largest group of social networks in both the U.S. and the world. The network encompasses billions of users (including hundreds of millions of Americans) that view and share content through mobile phones and computers every day. The Meta Defendants had the ability to also share certain data with the Google Defendants in joint efforts to harvest and monetize the personal data of millions of Americans. Through their platforms the Meta and Google Defendants can facilitate and guide the ways people seek and share information, engage in debate, participate in society and how they think. These platforms have become the public square on a massive scale. The Social Media Defendants' platforms are underpinned by algorithmic systems that process huge volumes of data to infer and develop detailed profiles of individual users and then use this mined data and artificial intelligence to shape and individually tailor each user's online experience in a way best designed to modify that user's behavior. In Roof's case, the foreseeably catastrophic results of this brainwashing and mind control were either embraced or at the very least consciously ignored.

19.    Plaintiff brings claims for product liability based on the Social Media Defendants' defective design of their products that renders such products not reasonably safe for ordinary users

in general, and adolescents and young adults in particular. It is possible to develop these products such that they will not cause online radicalization and will substantially decrease the risk, incidence and magnitude of offline violence. It is foreseeable that when such products are negligently designed (or purposefully designed) to drive extreme emotional responses, they can and do result in online radicalization that leads to offline violence. And it was entirely foreseeable to Defendants that maximizing engagement without regard to health and safety would cause both online radicalization and offline harm. The Social Media Defendants' conscious decisions to ignore the foreseeable harms their products were likely to cause in favor of profits was reckless at best and intentional at worst.

20.    Plaintiff also brings product liability claims based on the Social Media Defendants' failure to provide adequate warnings to adolescents and young adult users of the danger of mental, physical, and emotional harms, including online radicalization and offline violence, arising from the foreseeable use of their products. The Meta Defendants and the Google Defendants were all collectively reinforcing the risks of online radicalization by driving, rather than protecting adolescents and young adult users from, psychological manipulation.

21.    Plaintiff also brings claims for common law negligence arising from the Social Media Defendants' unreasonably dangerous products and their failure to warn of such dangers. They knew or, in the exercise of ordinary care, should have known that their products were harmful and causing online radicalization in a significant percentage of their adolescent and young adult users. Defendants failed to design their products to ameliorate these harms or warn adolescents and young adults and their parents of dangers arising out of the foreseeable use of their products. The Social Media Defendants' conduct was intentional, knowing, willful, wanton and/or reckless. The Social Media Defendants intentionally created algorithms that provided products focused

heavily toward inflammatory negative perspectives on issues deemed to be of interest to users. They simultaneously (and intentionally) failed to provide adequate balance to their algorithms and rejected any safeguards from the harmful effects they knew were occurring, including online radicalization and racially motivated incitement of violence. We now know from the release of the "Facebook Papers" by former-Facebook-employee-turned-whistleblower Frances Haugen that the Meta Defendants understood their platforms, algorithms, and products can and do cause significant psychological and behavioral harm to their users.

22.    Plaintiff also brings claims for product liability based on the Google Defendants' failure to provide non-defective products and/or adequate warnings to adolescents and young adult users of the danger of mental, physical, and emotional harms, including online radicalization and offline violence, arising from the foreseeable use of their products. Again, the Google Defendants presented Roof with well-packaged propaganda—misinformation published by a group with a respectable-sounding name and a history of racist messaging, a group that once referred to black people as a "retrograde species of humanity." Roof typed "black on white crime" into the search engine and fell into a wormhole. Google's chosen top results (or "hits") sent him to the website for the Council of Conservative Citizens, which offered page after page featuring what Roof referred to as "brutal black on white murders." Per his manifesto, Roof had "never been the same since that day." From that Google search, the results of which were – *by Google's design* – dominated by white supremacist propaganda, Roof immersed himself in white supremacist websites and content (upon information and belief, on Google, YouTube, Facebook and other platforms/websites online), as both a reader and participant. He honed in on "white replacement theory," a philosophy far removed from his upbringing that would eventually inform his manifesto and cause him to act on his online radicalization by committing a racially-motivated mass murder.

23. The first misstep was the product of the Google Defendants' defective search algorithm which not only failed to protect its users from misinformation and white supremacist propaganda but amplified it by design. Additionally, their product was vulnerable to outside manipulation from those trained in search-engine optimization (SEO). In 2013, 2014 and 2015 Google's algorithms did not adequately identify the coded language of white nationalist messaging and pseudoscientific racism. The Google Defendants had no desire to stem the flow of disinformation to the top of their search engines, again because such material was inflammatory, extreme and thus very engagement-inducing. Google provided Roof the initial gateway to hate that YouTube and Facebook further cultivated through shared personal data that captured his information and web history. Weaponizing that information, these Social Media Defendants then use psychologically manipulative formulae to control what users see and steer them toward content that confirms their likes, dislikes and biases. This is done to maintain and promote user engagement which helps to drive increasing advertising revenues. Instead of diverse perspectives, by design, the user is targeted with repetitive propaganda which leads to polarization and radicalization.

24. "Each link, every time you click on something, it's basically telling the algorithm that this is what you believe in," says James Hawdon, director for Virginia Tech's Center for Peace Studies and Violence Prevention. "The next thing you know… you just get led into this rabbit hole of increasingly extreme ideas." The initial Google search producing the Council of Conservative Citizens white supremacist website led Roof over time to even more radical racist hate sites like Stormfront and The Daily Stormer. And, again, upon information and belief, further confirmatory and inflammatory information and connections were pushed to Roof on YouTube and Facebook. Online radicalization is known to lead to acts of violence, and the mis-deeds of the Social Media

Defendants served as unseen forces *via* their algorithms to foreseeably push young impressionable adults toward dangerous online radicalization.

25.    Plaintiff also brings civil rights claims against the Defendants under the Ku Klux Klan Act of 1871 (also referred to as the Civil Right Act of 1871) and § Sections 1983 and 1985 of Title 42 of the United States Code, *et seq*. The Ku Klux Klan Act with 42 U.S. Code and § 1985(3) prohibits persons and corporations from conspiring to deny "either directly or indirectly, any person or class of persons of the equal protection of the laws."  It reads:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

26.    The Russian Defendants were actively and purposefully seeking to cause an increase in racial tension to cause civil unrest and did so with the knowledge that violence against African Americans more probably than not would occur based solely on their race. The Meta Defendants had a responsibility under civil law to not use their platforms/products to violate the civil rights of African Americans. The Meta Defendants knew or should have known when they sold advertisements to the Russian Defendants that the latter were actively and purposefully

causing online radicalization to susceptible users. Both the Russian Defendants and the Meta Defendants bear civil liability for the online radicalization of Roof that directly led to the targeting and murder of nine innocent people in a place of sanctuary. The targeting of the oldest African Episcopal Methodist Church in the Southern United States (founded in 1817) was meant to send a chill throughout the African American community in our country that not even in their churches would they be safe.  It is that attempt to cause widespread fear, intimidation, and intentional emotional distress that makes this violence an attack on all Americans.

27.    Both Democrat and Republican administrations have failed to successfully hold accountable those foreign actors who sought to damage race relations and increase racial divides in our country by infiltrating our social media platforms and using them to stoke anti-Black fear, violence, sentiment, and otherization, placing African Americans in South Carolina in fear and making it unsafe for them to live their lives in peace and prosperity, including attending normal church services. This assault on a protected class of Americans based solely on their race violates our U.S. civil law. Felicia Sanders and her teenage granddaughter bring this action to obtain some degree of justice from these Defendants and to reassure all African Americans living in the U.S. that they are entitled to the constitutional protections afforded to all of our citizens regardless of race, religion, or ethnicity.

## PARTIES

28.    K.M. is the minor grandchild of Felicia Sanders (hereinafter "Plaintiff," or "Felicia"). Felicia brings all actions for her grandchild as her Next Friend. Both Felicia and K.M. were citizens and residents of Charleston, SC at the time of the events complained of herein.

### The Meta Defendants

29.    Defendant Meta Platforms, Inc. ("Meta" or "Facebook") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1

Hacker Way, Menlo Park, California 94025. Until October 2021, Meta was known as Facebook, Inc. and is interchangeably referred to by its better-known moniker "Facebook" herein.[2] Facebook does business in this Country, the State of South Carolina, and across the Unites States.

30.    Defendant Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

31.    Defendant Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

32.    Defendant Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012 and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

---

[2] *See* fn. 1, *supra*, regarding the short-hand used to describe the different groupings of Defendants herein. To the extent any individual entities within each defendant-group need be referenced specifically herein, further short-hand is given in this "PARTIES" section of the Complaint.

33.    Defendant Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

34.    Defendant Facebook Technologies, LLC ("Facebook 4") was incorporated organized in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

35.    Defendant Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated or re-organized the company on April 7, 2012 in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

36.    Defendant  Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

**The Google Defendants**

37.    Google Inc. was incorporated in California in September 1998 and reincorporated in Delaware in August 2003. In or around 2017, Google Inc. converted to a Delaware limited liability company, Defendant Google, LLC (together with its predecessor-in-interest Google Inc.) ("Google"). Google's principal place of business is in Mountain View, CA.

38.    Since 2006, Google has operated, done business as, and wholly owned as its subsidiary Defendant YouTube, LLC ("YouTube"). YouTube is a Delaware limited liability company with its principal place of business in San Bruno, CA. YouTube is widely available to consumers throughout the United States.

39.    On October 2, 2015, Google reorganized and became a wholly owned subsidiary of a new holding company, Defendant Alphabet Inc., a Delaware corporation with its principal place of business in Mountain View, CA.[3]

40.    Google and YouTube, under Alphabet's umbrella, are alter egos of one another: together and in concert they own, operate, control, produce, design, maintain, manage, develop, test, label, market, advertise, promote, supply, and distribute the app YouTube.

**The Russian Defendants**

41.    Defendant INTERNET RESEARCH AGENCY LLC (Агентство Интернет Исследований) ("ORGANIZATION") is a Russian organization engaged in electoral interference operations. In or around July 2013, the ORGANIZATION registered with the Russian government as a Russian corporate entity. Beginning in or around June 2014, the ORGANIZATION obscured its conduct by operating through a number of Russian entities, including Internet Research LLC, MediaSintez LLC, GlavSet LLC, MixInfo LLC, Azimut LLC, and NovInfo LLC.

42.    Starting in or around 2014, the ORGANIZATION occupied an office at 55 Savushkina Street in St. Petersburg, Russia. That location became one of its operational hubs from which the Russian Defendants and other co-conspirators carried out their activities to interfere in

---

[3] *See, e.g.*, Alphabet Inc., *Form 10-Q*, Oct. 25, 2022, at 4 (defining Alphabet as "Alphabet Inc. and its subsidiaries"), available at
https://www.sec.gov/Archives/edgar/data/1652044/000165204422000090/goog-20220930.htm.

the U.S. political system, including the direct attempt to incite racially motivated violence in the U.S. by infiltrating social media platforms such as Facebook, Instagram and YouTube.

43.     The ORGANIZATION employed hundreds of individuals for its online operations, ranging from creators of fictitious personas to technical and administrative support. Its annual budget totaled the equivalent of millions of U.S. dollars. It was headed by a management group and was organized into numerous departments including graphics, data analysis, search engine optimization (SEO), and an information-technology (IT) department to maintain an elaborate and highly sophisticated digital infrastructure used in its nefarious operations targeting racial hate in the United States.

44.     The ORGANIZATION also maintained a finance department to budget and allocate funding. The ORGANIZATION sought to conduct what it labeled as "information warfare against the United States of America" through numerous fictitious U.S. personas on social media platforms and other Internet-based media.

45.     Sometime around April 2014, the ORGANIZATION formed a special department that was referred to as the "translator project." This project focused on the U.S. population and conducted specially planned operations to increase racial hate and animosity *via* social media platforms such as Facebook, Instagram, YouTube, and Twitter. The ORGANIZATION's goal, or at least a large part thereof, was to spread fear and distrust among the races in an effort to increase political unrest in the United States.

46.     Defendants CONCORD MANAGEMENT AND CONSULTING LLC and CONCORD CATERING (the "CONCORD entities") are related Russian entities with various Russian governmental contracts and relationships. These entities were the ORGANIZATION's principal source of funding for its nefarious attacks on the societal fabric of the United States. They

controlled funding, recommended personnel, and oversaw the ORGANIZATION's activities through reporting and interaction with ORGANIZATION management.

47.     Defendant YEVGENIY VIKTOROVICH PRIGOZHIN (PRIGOZHIN) is a Russian national who controlled the Concord entities. PRIGOZHIN approved and supported the operations of the ORGANIZATION to cause racial chaos in the U.S. He directed the generation of content used to incite racially motivated violence in the U.S. He has close ties to the Russian Government and has been sanctioned by the Office of Foreign Assets Control of the U.S. Treasury Department for his role or complicity in, or having directly or indirectly engaged or attempted to engage in, election interference and political destabilizing activity in U.S. or other foreign election for or on behalf of, or for the benefit of, directly or indirectly, the Government of Russia.

48.     PRIGOZHIN, since at least 2014, has been part of a broader Russian effort known as "Project Lakhta," which was an attempt on behalf of Russian Government proxies to engage in political and electoral interference operations targeting other countries including the U.S., members of the EU, and the Ukraine. The U.S. Treasury has taken action against PRIGOZHIN for being the financier of the ORGANIZATION and for attempting to subvert U.S. Democracy.[4]

49.     PRIGOZHIN has used a complex network of shell and front companies to evade U.S. sanctions and to obscure his ownership. Current U.S. Treasury sanctions have resulted in the

---

[4] For further detail regarding the Russian Defendants' actions and support for the allegations contained in Paragraphs 39-46 above, *see U.S. v. Internet Research Agency, LLC, et al.*, Docket # 1:18-cr-00032-DLF, Doc. 1 (D.C. 2/16/18); "Report on the Investigation into Russian Interference in the 2016 Presidential Election," Vol. I, U.S. DOJ, Special Counsel Robert S. Mueller, III (March 2019) (the "Mueller Report"), available at: https://www.justice.gov/archives/sco/file/1373816/download; and Report of the U.S. Senate Select Committee on Intelligence on "Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Vol. 2: Russia's Use of Social Media with Additional Views" (Nov. 2020), available at: https://www.intelligence.senate.gov/publications/report-select-committee-intelligence-united-states-senate-russian-active-measures.

freezing of his and his various shell companies' assets including properties and bank accounts, and U.S. persons are prohibited from engaging in any business transactions with him (he has been designated pursuant to Executive Orders [EO's] 13848, 13694, as amended, 13661, and 14024). The U.S. Treasury, through its Office of Foreign Assets Control (OFAC) and with assistance from the U.S. State Department and Commerce Department, has blocked and frozen over $30 billion dollars in Russian Oligarch sanctioned property and funds including those of PRIGOZHIN.

50.     PRIGOZHIN also recently admitted he founded the "Wagner Group" in 2014. This shadowy private military company has supported the Kremlin's military campaigns in Africa and the Middle East, occasionally doing battle against U.S. military forces. In a September 26, 2022 statement from PRIGOZHIN posted by the press service for his company CONCORD MANAGEMENT AND CONSULTING, he admitted his role in forming and implementing the Wagner Group.

## JURISDICTION AND VENUE

51.     Venue is proper in this Court in that a substantial part of the acts and/or omissions forming the basis of these claims occurred in the District of South Carolina, Charleston Division.

52.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) as complete diversity exists between Plaintiff, a South Carolina domiciliary and resident, and Defendants, who are Russian corporations and individual(s) (non-U.S. entities and non-citizens residing abroad are considered diverse from Plaintiff for purposes of this Court's jurisdiction) and numerous Delaware corporations  or limited liability companies having their principal places of business in California and/or having their membership comprised of California domiciliaries/entities.

53.     Jurisdiction over the Russian Defendants is proper due to their actions directed at or intended to produce tortious harm and/or civil-rights-violation consequences, and which did produce such harm or consequences, in the State of South Carolina, by and through which the

Russian Defendants have purposefully availed themselves of the jurisdiction and laws of South Carolina. These deliberate actions and/or intended consequences gave rise to and are the subject of this Complaint and its detailed facts below such that specific personal jurisdiction over the Russian Defendants is proper in this case. Collectively all the Russian Defendants were active in commerce in South Carolina. The ORGANIZATION actually sent agents into the United States, interfaced with a significant percentage of the population of the State of South Carolina, and purposefully availed itself of the benefits of transacting business here. PRIGOZHIN and the ORGANIZATION specifically targeted seven southern states including South Carolina for their racial discord attack. The exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

54.    Jurisdiction over the Meta Defendants and the Google Defendants is proper due to their actions directed at or intended to produce tortious civil harm and/or the violation of civil rights, and which did produce such harm, in the State of South Carolina, by and through which the Meta and Google Defendants have purposefully availed themselves of the jurisdiction and laws of South Carolina. These actions and/or intended consequences gave rise to and are the subject of this Complaint and its detailed facts below such that specific personal jurisdiction over the Meta and Google Defendants is proper in this case. The Meta Defendants and the Google Defendants advertise extensively in South Carolina, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile phones prior to sale. The Meta Defendants and the Google Defendants have earned millions of dollars in annual revenue from their South Carolina-related

activities over the last several years arising from their defective and inherently dangerous social media products, including those that promote race-based hate and violence.

55. This Court also has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1331 because claims in this case arises under the laws of the United States. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

56. The Russian Defendants, posing as U.S. persons and creating false U.S. personas, operated social media pages and groups designed to attract U.S. audiences. These groups and pages, which addressed divisive U.S. political and social issues, falsely claimed to be controlled by U.S. activists. These Defendants also used the stolen identities of real U.S. persons to post on ORGANIZATION-controlled social media accounts. Over time, these social media accounts became the Russian Defendants' means to reach significant numbers of Americans in 2014 and 2015 for purposes of causing racially based provocation and unrest with the goal of interfering with the U.S. political system, including the presidential election of 2016.

57. Certain of the Russian Defendants traveled to the U.S. under false pretenses for the purpose of collecting intelligence to inform these Defendants' operations. The Russian Defendants also procured and used computer infrastructure, based partly in the U.S., to hide the Russian origin of their activities and to avoid detection by U.S. regulators and law enforcement.

58. Upon information and belief, the Social Media Defendants had knowledge or reason to believe these were coordinated actions by hostile Russian actors but did not report the inauthentic activity and, instead, aided and abetted it because it drove engagement and profits. Accordingly, this action seeks the award of compensatory damages to redress the harm to K.M. caused by Defendants' use of hate, vitriol, intimidation, and threats of violence to interfere

with the civil rights and basic human rights of people based on their skin color and punitive damages to punish Defendants for the purposeful, reckless, and malicious manner in which they conspired and acted and to forever deter a recurrence of this unlawful conduct.

59.     The attack on the Reverend Pinckney and his parishioners was a direct, intended, and foreseeable result of Defendants' unlawful conspiracy.  It was instigated by a common plan that the Russian Defendants had to cause increased hostility, distrust, and violence among the races. As part of their plan, the Russian Defendants acted in concert to cause this violence and distrust among the races for the purpose of inciting racism and violence. They promoted white supremacist theories and planted hundreds of hate propaganda messages online meant to inspire and grow the white supremacy movement.[5]

60.     Google had knowledge its search algorithms had been developed such that that they could and would promote false propaganda written by extremists over accurate information from reliable sources. Roof's radicalization began with the simple words "black on white crime" which led him to pages upon pages of brutal black on white murders, as he described. Google says its algorithm takes into account how trustworthy, reputable, or authoritative a source is, yet it is clear in Roof's case it immersed him in hate materials.

61.     The Southern Poverty Law Center, in its analysis of the Charleston massacre and the online radicalization of Roof, noted "Google's algorithm can promote false propaganda written by extremists at the expense of accurate information from reputable sources," and "Google says its algorithm takes into account how trustworthy, reputable or authoritative a source is. In Roof's

---

[5] For further detail regarding the Russian Defendants' actions and support for the allegations contained in Paragraphs 56-59 above, *see* materials cited in fn. 4, *supra*. Throughout this Complaint, these materials are heavily relied upon for the allegations concerning the conduct and actions of the Russian Defendants.

case, it clearly did not." In response to criticism after the shooting, Google made a statement to thegrio.com: *"The views expressed by hate sites are not in any way endorsed by Google, but search is a reflection of the content and information that is available on the Internet. We do not remove content from our search results, except in very limited cases such as illegal content, malware and violations of our webmaster guidelines."*

62. In her testimony on January 15, 2020 before the Subcommittee on National Security, International Development and Monetary Policy of the U.S. House Committee on Financial Services, Lecia Brooks of the Southern Poverty Law Center noted that a surging white nationalist movement in the U.S. was "rooted in a toxic, anti-democratic white supremacist ideology that is metastasizing on social media networks and other websites that traffic in hate. These networks are not only radicalizing people but are, in effect, incubating new terrorists–typically young white men who are motivated to act by what they call 'white genocide.'" Google has placed ads on hate group websites funneling money to them from mainstream advertisers. It was only after Roof's massacre that Google began to rapidly pull ads from hate group sites. What we know now is Google's hate algorithms were defective products that allowed white supremacist propaganda and websites to flourish and have prominence on Google search in a way that overly, by design, promoted hate.

63. The Google Defendants helped foment a new network of extremists that has been described as a *post-organizational paradigm* where white supremacists increasingly radicalize and operate together without easily recognizable branding, membership, hierarchy or even connection. This decentralized organizing principle predates the Internet, but the Google Defendants fostered an expansion of this concept of leaderless resistance, in turn fostering online radicalization of young people. In many cases, there is no evidence that perpetrators are taking orders from a source of authority. Instead they are acting on their interpretation of the movement's ideals and broadcasting

those back through manifestos and lone-wolf attacks. Google, Facebook and YouTube (*i.e.*, the Google and Meta Defendants) facilitated the rise of these informal white supremacist communities and their movements online-to-offline. Not only have Google and YouTube search and other algorithms, as well as the Meta Defendants' algorithms (ad recommendation, friend/connection recommendation algorithms, etc.) made it easy to find, join, and become radicalized into white supremacist ideas and groups, the design of their products has actually actively promoted it. Online radicalization no longer requires direct investment from white supremacy groups toward in-person and physical vetting. Extremist ideas are easily shared with younger people who would not otherwise be recruitable at public bars or white-power events, as in the past.

64.    Roof radicalized online, and the Google Defendants played a leading role in that process. At the time Roof radicalized, moreover, the Google Defendants were helping promote racism and hate in the U.S. The Google Defendants offered advertisers hundreds of millions of choices for YouTube videos and channels related to White supremacist and other hate terms including *White Lives Matter*, described by the Southern Poverty Law Center as both a neo-Nazi group and "a racist response to the civil rights movement "Black Lives Matter."

65.    In 2015, the Google Defendants' ad-buying platform "Google Ads" blocked the phrase *Black Power*. Yet Google Ads offered more than 100 million YouTube videos and channels related to the phrase *White Power*. What this means is Google deliberately designed its product to treat black Americans dissimilarly to white Americans and to do so by allowing/endorsing proliferation of white supremacist extremism while quelling black empowerment (these terms are far from equivalent in their respective connotations). It is undeniable that racially discriminatory ideology is embedded within Google's Ad function when it bans *Black Power* but markets and promotes *White Power*. Google thus fundamentally developed a product for the dissemination of racially

based hate and white supremacy. This hate-for-profit policy was valued above and beyond any desire to improve social and racial justice.

66.   Online radicalization involves a systematic progression toward more extreme content. Heavily impacting the progression is YouTube's recommendation algorithm, which includes the software that determines the videos that appear on the users' home pages and inside their *Up Next* sidebar. This algorithm is typically responsible for more than 70% of all time spent on the site. YouTube (*i.e.*, Google) created a business model through the design of its algorithms that rewarded proactive videos with exposure and advertising dollars while also guiding users down personalized paths meant to keep them coming back for more. In 2014-2017, the company leaders were obsessed with increasing user engagement and rarely considered whether the algorithms were fueling the spread of extreme and hateful content precisely because they knew the more extreme and more negative-emotion-inducing the content, the more engagement it generated. YouTube's algorithms were designed and modified, according to former YouTube engineer Guillaume Chaslot, to "increase the time people spent online, because it leads to more ads." Google, in 2015, deployed their research team from Google Brain (Google's Artificial Intelligence Division) to rebuild YouTube's recommendation system around neural networks in an attempt to mimic the human brain. They developed a new algorithm based on this new AI and called it "reinforcement learning" or "Reinforce." The purpose was to create a kind of long-term addiction machine and was a huge success according to Minmin Chen, a Google Brain researcher.

67.   Because the Google Defendants track and monitor what their users are looking at, they have the ability to create a digital profile of the user. Like the Meta Defendants, they then use that data to aid companies like Cambridge Analytica to microtarget and manipulate individuals. The Google Defendants themselves recommend content to users based upon the content and what it

knows about the user. It becomes, through the Google Defendants' algorithms, a method of targeting people individually to recruit them to an ideology. It is high-level social engineering *via* product design that psychologically captures people and then feeds them a continuous volume of propaganda to maximize the emotional effects of the ideology. When the algorithm is applied to amplify race-based and hate-based ideologies, it organically serves to radicalize the user. This is especially true when dealing with young men.

68. The entirety of a Google page of generated hits in response to a search, likewise a YouTube search hits page, is a configuration entirely designed by the Google Defendants. Users/searchers do not just see the search "hits" but see a meticulously designed mix of individually-tailored ads and content generated by design of the product (algorithm) itself for the sole purpose of generating addiction (that the industry semantically mollifies by using the term "engagement"). The individual tailoring is made possible only because of the data the Google Defendants gather through machine-learning and then weaponize against the user. And like the Meta Defendants, the Google Defendants are in endless pursuit of perfecting their algorithms to best drive "engagement" of each and every individual user – that is, the Google Defendants are forever tweaking their algorithms to better learn you, better target you, and better modify your behavior in a direction that drives you to further platform engagement (*i.e.*, addiction to the product).

69. Since the Google Defendants are armed with knowledge the more extreme and negative-emotion-inducing the content and ads, the more they drive engagement, they have consciously disregarded clear and present moral hazard and actual real-world danger in favor of profits by designing products with no safeguards to prevent addiction and mental health harm nor to prevent streams of foreseeably violence-inducing content that their product identifies as engagement-inducing to a particular user. And the Google Defendants well know the similarity of the content

being pushed to each individual user because their algorithms are also designed to do just that – identify and categorize content to package and deliver in as targeted a manner as possible.

70. Effectively, YouTube serves as a match-maker between like-minded people, introducing users to other users and videos that they will be interested in based on the Google Defendants' algorithmic knowledge regarding the video and account information and characteristics. It also removes the need for the user to actually choose to continue the "engagement" with the targeted content by automatically loading and playing the next algorithm-selected video when the prior one ends (by and through the product design features autoplay and "UpNext"). The Google Defendants could redesign their products to ameliorate foreseeable harms like the occurrence made subject of this Complaint but choose not to in favor of profits.

71. And none of this is a secret anymore. Eric Schmidt, the former CEO of Google and more recently, Alphabet, YouTube's (and the new Google, LLC's) corporate parent, recently acknowledged the powerful, and purposeful, addictive and outrage-maximizing effect of social media (to which the Google Defendants' YouTube product is no exception, far from it – an industry leader). Social media products are about "maximizing revenue," Mr. Schmidt said, and the best way to maximize revenue is to "maximize engagement." As Mr. Schmidt continued, in pursuit of their goal of maximizing engagement to increase revenues, social media products "play into the addiction capabilities of every human."[6] This is the case, *by design*, regardless of where that addiction leads, whether to an unhealthy level of consumption of benign content like funny cat videos or the like or to really mentally harmful content like white supremacist propaganda (or as in another currently ongoing case, ISIS propaganda) that leads to extreme and violent thinking

---

[6] Issie Lapowsky, *Eric Schmidt: Social Media Companies 'Maximize Outrage' for Revenue*, Protocol (Jan. 6, 2022), https://www.protocol.com/bulletins/eric-schmidt-youtube-criticism.

and behavior.[7] YouTube's design, in particular, includes specific, carefully calibrated features that are known to exploit the mental processes of its users, again in individually tailored fashion, to keep each individual user engaged for as long, as frequently, and as intensely as possible (what they refer to as the induced "flow" state).

72.   In 2014-2016 the Russian Defendants, in an effort to destabilize the social matrix of the United States along racial lines, created a vast system of hundreds of different websites and generated hyperlinks to all the sites. Together this created a disproportionate system of right-wing content distribution that completely diluted the mainstream fact-based media. While the Russian Defendants were motivated by ideology and political destabilization, the Google Defendants, like the Meta Defendants, were motivated by increasing the time its users spent online to drive more advertising revenue. The Google Defendants, of course, knew through their study of human psychology, and Google Brain, the more content tends to drive a negative emotional response (*i.e.*, in this context, the more extreme the content) or the more it reinforces the feelings that the Google algorithm learns an individual may have, the more the Google product will drive engagement. Moral hazards abounded, preventable harms were disregarded, and driving profits won the day a

---

[7] Indeed, former Google engineers told the Wall Street Journal that "[t]he algorithm doesn't seek out extreme videos … but looks for clips that data show are already drawing high traffic and keeping people on the site. Those videos often tend to be sensationalist." *See Why is YouTube Suggesting Extreme and Misleading Content (2/7/18)*, https://www.youtube.com/watch?v=7AjA3Df6i6o. That is a vast understatement. As an investigation by *Bloomberg* put it simply: "In the race to one billion hours [per day of engagement on YouTube], a formula emerged: Outrage equals attention." Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg (Apr. 2, 2019), https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant. Bergen's lengthy investigative piece specifically references an insider account of having raised concern regarding and shown data (he "created an internal vertical that showed just how popular they were") regarding the alarming spread of "alt-right" video bloggers and hate/outrage generation and having his red flag, like all others that were a threat to growing engagement, ignored. *Id*.

long time ago, and the strategy has only become more and more refined over time since the Google Defendants hone their algorithms constantly to better drive extreme, flow-state inducing, negative emotional response.

73.  Neither the Google nor Meta Defendants make their algorithms public. These algorithmic *black boxes* were denounced by Frank Pasquale, Professor of Law at the University of Maryland. He calls Google and Facebook "a terrifying duopoly of power" and has been leading a growing movement in academics calling for "algorithmic accountability," stating "we need to have regular audits of these systems." Professor Robert Epstein, a research psychologist at the American Institute for Behavioral Research and Technology, has noted these algorithms will include negative suggestions in a search for racially motivated terms. Epstein notes that "people don't question this. Google isn't just offering a suggestion. This is a negative suggestion, and we know that negative suggestions depending on lots of things can draw between five and fifteen more clicks. And this is all programmed. And it could be programmed differently." Professor Epstein has studied the influence of the search ranking on the user's views and opinions and found that "the public are completely in the dark about very fundamental issues regarding online search and influence. We are talking about the most powerful mind-control machine ever invented in the history of the human race. And people don't even notice it."

74. The Google and Meta Defendants, through their algorithms and data-mining and harnessing of AI, are able to create false and increasingly negative realities for each user on an individually-tailored basis. They understand your emotional responses and how to trigger them and move them in more extreme and more negative directions (i.e., more engagement-inducing directions). They know your likes, dislikes, where you live, what you eat, etc. and they use all of this to make you spend more time online to drive revenue for them.

75.     For the Meta Defendants' part, it is not a serious matter of dispute any more that this sophisticated social media conglomerate knew at least by 2014 that online radicalization leads to offline violence. Although no single item of extremist propaganda is guaranteed to transform someone into a violent radical or terrorist, online radicalization is expected when individuals engage with extremist content for extended periods of time. The effect is amplified by repeated exposure to inflammatory graphic images and video resulting in emotional desensitization. Some participants—like Roof—become so worked up that they carry out violent acts offline.

76.     The Meta Defendants algorithms are very successful in doing exactly what they are programmed to do: create a system in which the self-affirmation of its users continues to grow and magnify. The goal is behavioral modification. And the algorithms in question have enjoyed unprecedented success in this arena, with many who have studied them deeming them perhaps the most sophisticated and advanced mind control devices the world has ever known. This becomes even more problematic as individuals turn to the Internet and social media as their main source of news. But the most fundamental problem with these behavioral modification devices here is how white supremacists have used them to spread lies, violence, and hate freely and very effectively. Foreign governments have also sought to spread hate and discord along racial lines through false Facebook accounts and staged content.

77.     The Russian Defendants knowingly and intentionally caused racial unrest and racial violence in the United States to destabilize any semblance of racial reconciliation in the United States for strategic political purposes.

78.     The Meta Defendants conspired with the Russian Defendants to deprive African Americans of their fundamental right to vote and equal protections of the law, knowingly and recklessly producing racial animus, distrust, and hate. The Russian Defendants worked together to

use Facebook's algorithms to proliferate race-based hate and amplify lies promoting violence against African Americans and discouraging them from voting.

79.    The Google Defendants, in turn, conspired with the Meta Defendants through data sharing regarding users to best optimize their own products' ability to addict their common users and best manipulate their thinking and behavior. Both the Google and the Meta Defendants did so to drive engagement (and, therefore, profit), but the fact that they participated in the strategy/plan of stoking racial animus for profit, rather than for the same reason(s) as the Russian Defendants, is no bar to civil conspiracy claims of the type alleged here. Nor do all of the members of the conspiracy need to be aware of all other involved members, the full extent of the conspiracy, or all involved actions of other co-conspirators under South Carolina law. They need only share the same invidiously and racially discriminatory objective (not purpose) and act in furtherance thereof.

80.    What we know at this point is that the Google and Meta Defendants conspired with one another to drive engagement, and acted in furtherance thereof in part, by driving racial hate and animus in certain users through shared mined data. Upon information and belief, the Meta Defendants in turn conspired with the Russian Defendants for purposes of the same invidiously and racially discriminatory objective and acted in furtherance thereof by continuing to sell advertisements to accounts it knew to be inauthentic, of Russian origin and linked to Russian political influence campaigning. The links between the Meta Defendants and the Russian Defendants are further detailed below.

81.    The Meta Defendants knowingly conspired with the Russian Defendants to sow discord by using online radicalization to deprive African Americans of their fundamental right to vote and equal protection of the law. The Meta Defendants, familiar with the individual interests of their users, knowingly exploited the users through highly engineered, algorithm-driven

behavioral and psychological manipulation. Meta exploited the users for its own profit-driven motives as a result of its goal to maximize engagement (and, *ipso facto*, profits).

82.    The Russian Defendants and the Meta Defendants worked together to violate the civil rights of Plaintiff and her family including by depriving them of due process and equal protection of the law.

83.    Plaintiff expressly disclaims all claims seeking to hold the Google or Meta Defendants liable as the publishers or speakers of any content provided, posted, or created by third parties.

84.    No extremist groups conspired with Roof to carry out this vicious hate crime. Instead, Roof consumed evil propaganda via the Facebook, Google, and YouTube platforms, which had all the inflammatory racially disparate white-power propaganda that he needed to motivate himself to carry out mass carnage against innocent Blacks. Roof was able to complete the process, striking viciously without detection by law enforcement.

85.    He was a classic lone wolf. A violent actor disconnected from traditional hate or terrorist groups. These radicalized lone wolf assailants are tougher to predict and are more capable of unrestrained violence because they don't have a group of peers to hold them accountable. Law enforcement described Roof as "a person drifting through life who had access to a computer, a classic lone wolf." Lone-wolf attackers are often people with stress and instability in their lives. Many lone wolves have some previous criminal behavior; few close personal relationships; and a tendency to let anger fester over perceived affronts, even if they were not directed personally to them. Brian Levin, Director of the Center for the Study of Hate and Extremism at Cal State San Bernadino studied Roof and noted that "the lone wolf, often times, is really living in a world of his own pain and doing, and feels that he's not understood, and wants power and control."

86.    Roof chose the Emanuel AME Church because it is a prominent symbol among African Americans. Emanuel AME's congregation dates to 1818 when it was founded as the first African Methodist Episcopal church in the South. It remains the oldest.

87.    Far-right domestic extremist groups have glorified the concept of leaderless resistance. This concept was first defined by white supremacist Louis Beam and gained traction in the white supremacy movement in the early 1990s. Jeffrey D. Simon, author of "Lone Wolf Terrorism: Understanding the Growing Threat," noted "we find lone wolves across the entire political or religious spectrum." Roof had no school, no friends, no clique with which to associate.

88.    Roof complained about Blacks taking over and ruining the country. The 2012 shooting death of Trayvon Martin became his triggering point in obsessing over racial issues. He looked to Google in search of answers for "black on white crime." He was directed to a website run by a White nationalist group called the Council of Conservative Citizens (CCC).[8] He joined extremist groups on Facebook. Ultimately, Roof reached a conclusion after being involved on the Internet and Facebook that no one was really doing anything but talking and that "Well, someone has to have the bravery to take it to the real world, and I guess that has to be me."

---

[8] Notably, the Meta Defendants took direct part in increasing the visibility of the Council of Conservative Citizens' website and its web presence generally—the Meta Defendants actually auto-generated the CCC's Facebook page (one way in which the Meta Defendants do, despite its legal arguments to the contrary, aid in development or creation of user ("third party") content. *See* Tech Transparency Project, *White Supremacist Groups are Thriving on Facebook* (May 2020) at p. 6, avail. at: https://www.techtransparencyproject.org/sites/default/files/Facebook-White-Supremacy-Report.pdf ("One of the auto-generated hate group Pages with the most 'likes' in TTP's analysis was for the [CCC], an SPLC-designated white nationalist group. The group made headlines in 2015 after an online manifesto linked to white supremacist Dylann Roof referenced the organization … **Facebook's auto-generated Page for the [CCC] included a description of the group's white supremacist affiliations, complete with direct link to their website**.")

89.    When Roof met Facebook, Google and YouTube, these platforms were already many generations along in their design and sophistication—designs meant to learn Roof (like they do all of their users) and drive his engagement by addicting him to the content they deliver.

90.    Roof radicalized online, and Google, YouTube, and Facebook were substantial factors in that process. At the time Roof radicalized, moreover, the Social Media Defendants were helping promote racism and hate in the United States. First by allowing white supremacy groups essentially unrestricted access to spread hate and introduce a whole new generation of impressionable young people to ideologies based on hate and racial divide, but also by amplifying this content through product design due to its superior ability to drive engagement in certain users. The Meta Defendants also allowed Russian intrusion into our race relations within the U.S. by allowing numerous fraudulent campaigns on Facebook to incite racial discord and polarization.

91.    Stoking racial tensions and promoting tribalism proved, quite distressingly, to fall more in line with the Meta Defendants' profit motives (its mission statement of inclusivity and community notwithstanding). Facebook facilitated, via its platform, a repugnant and fraudulent propaganda attack on African Americans and their role within the fabric of the United States. It did so with knowledge that many third-party advertisings and postings that it sold and disseminated to millions of Americans were false and that identities and associations were being misrepresented by these third parties. It also knew these third parties were purchasing the advertisements to promote racism, division, chaos, and distrust among American citizens.

92.    Many of these ads and posts were purchased by foreign governments working through shell companies, such as the Russian-based Internet Research Agency. These ads were purchased deliberately to discredit, shame, dishonor, and demean African Americans and particularly high-profile individuals like State Senator/Reverend Pinckney. The ads blatantly

inflamed racial tensions, divided Americans, sought to decrease African American voter turnout and perverted the truth about crime involving African Americans. Facebook directly enabled and allowed white supremacy groups and foreign governments to target Americans with messages and video content meant to sow racial discord, tortuously affect race relations, and decrease the African American vote. Facebook also deliberately created the inherently racially biased tool chest that made it possible. YouTube/Google, as described above, were little different in this regard, of course with Roof himself having credited Google's chosen search "hits" for his "black on white crime" search (which prominently displayed the Council of Conservative Citizens' racist and violence promoting content) as the very beginning of his online journey to mass racial murder.

93.    There exists compelling evidence, through the work of Special Counsel Robert Mueller and the Reports of the U.S. Senate Select Committee on Intelligence on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, showing the method and degree of this criminal and civil conspiracy. In March 2019, Special Counsel Mueller and the Department of Justice ("DOJ") published a "Report On The Investigation Into Russian Interference In The 2016 Presidential Election" charging 13 Russian Nationals and three businesses (including the Internet Research Agency) with conspiracy, identity theft, failure to register as foreign agents, and violations of laws that limit the use of foreign money in American elections.  In 2015 the defendant Internet Research Agency produced hundreds of graphic and fractious social-media messages meant for distribution on Facebook. These messages were racially incendiary, submitted to Facebook, and were then published as if they were posted by American citizens. Many of these postings were made to both discourage communities of color from voting and to promote the importance of voting to other groups.

94.     Online radicalization involves a systematic progression toward more extreme content. Heavily impacting the progression is Facebook's Ad recommendation algorithm. This algorithm is typically responsible for more than 70 percent of all time spent on the site. Facebook algorithms created a business model that rewarded provocative content with exposure and advertising dollars while those algorithms also guided users down personalized paths meant to keep them coming back for more. In 2014-2017, the company leaders were obsessed with increasing user engagement and rarely considered whether the algorithms were fueling the spread of extreme and hateful content.

95.     The Russia Defendants have embraced modern technology. Extremist groups also use electronic communications to further spread and effectuate racially discriminatory and violent agendas. They are masters of camouflage, appearing harmless and inconspicuous on discussion boards. They often mask their true intentions by appearing to share general knowledge and information while actually peddling racist rhetoric. This includes challenging historically common knowledge about prior racially discriminatory and violent periods such as the Holocaust, the Civil Rights Movement, and the legal institution of slavery in the United States.

96.     As the problem of online radicalization became more widespread, parents like Joanna Shroeder, a mother of three, sent out a strong call of action to other white parents regarding the insidious nature of violent white supremacist and alt-right web sites. Homophobia, anti-Semitism, and racism were invoked to indoctrinate young white men into the world of violent far-right extremism and white supremacy.

97.     Roof's criminal defense attorney argued to the jury that "[t]here is hatred all right, and certainly racism, but it goes a lot further than that" and that "every bit of [his] motivation came from things he saw on the Internet. That's it. ... 'He is simply regurgitating, in whole paragraphs,

slogans and facts –bits and pieces of facts that he downloaded from the Internet directly into his brain.'"

98.    In the past, Facebook has taken the position that it is not a media company and therefore is not responsible for the content, posting, and actions of third parties on its platform. Likewise, Google/YouTube. While perhaps not content providers of the individual ads and content themselves under the Communications Decency Act (the "CDA"; 47 U.S.C. § 230(c)(1)), they still bears separate and distinct responsibility for their racially biased platforms and algorithms and their own independent civil rights violations. The Social Media Defendants' lawyers have carried this "CDA shield" like a get-out-jail-for-free card. But as recent decisions have shown, the CDA does not provide blanket immunity to these entities in all circumstances, particularly not where their own product design decisions were an independent causal factor in the harm or where other federal laws have been knowingly and/or recklessly violated. In prior cases where this shield was used successfully, the issues did not involve the suppression of the right to vote and/or other civil rights violations and the targeting of a civil rights movement.

99.    Former Facebook employees and investors, including Roger McNamee, have shown that Facebook knew that some of the content it disseminated was false and involved foreign manipulation of domestic messaging. In fact, it has been reported that Facebook purposefully removed certain filtering and/or monitoring it previously had in place to boost advertising revenue. That is, Facebook chose to allow this wrongful activity for profit, recklessly disregarding the harm to those like the Reverend Pinckney such activity was causing.

100.    The evidence showing the nefarious activities of the Russian-based Internet Research Agency has been documented by numerous reports. See, e.g., DiResta, et al., *The Tactics and Tropes of the Internet Research Agency, New Knowledge* (Nov. 8, 2018); and Howard, et al.,

*The IRA, Social Media and Political Polarization in the United States*, 2012-2018, Computational Propaganda Research Project, Univ. of Oxford (Jan. 23, 2019). These actions led to more racial polarization and distrust.

101. Former United States Attorney General Loretta Lynch indicted Roof on federal hate crime charges for attacking Pastor Pinckney and the other church members "because of their race and in order to interfere with their exercise of their religion." Federal prosecutors noted that the media Roof consumed online "are consistent with the adoption of a white supremacy extremist ideology, including a belief in the need to use violence to achieve white supremacy."

102. After his brutal attack, officials found a manifesto online belonging to Roof that was filled with racist characterizations of black people and others. Prosecutors noted that the evidence strongly indicates Roof's sentiments toward racially motivated hate grew in the months before the attack.

103. Dr. Heidi Beirich, Director of the Southern Poverty Law Center's Intelligence Project and an expert in white-supremacist extremism wrote:

> Dylann is quite unique from most White supremacist killers. For one, he's far younger. The truth is that most White supremacist killers are in their late 30s, early 40s, and some are even as old as in their 70s in their 80s. That is different than radical Islamic killers who are a little bit more like Dylann Roof. They're younger. That's because most White supremacists go through a much longer indoctrination period that involves usually being involved in particular organizations in the real world. As far as we know, Dylann Roof didn't do that and that makes him very different. In fact, if he's like anything, he's like ISIS people. Young people who look at ISIS Twitter accounts, get sucked into that ideology, and then go join the fight in Syria or commit domestic terrorist attacks. He's actually rather unlike your typical White supremacist killer. This complete online radicalization over the maybe two and a half years he was in his room is very atypical.

104. Long ago, as has been widely reported as well as testified to (including by the recent whistleblower, Frances Haugen), Facebook learned that negative-emotion-inducing content more

effectively fostered user engagement and addiction, thereby generating massive profits. The same applies to Google/YouTube

105.    So these entities, albeit publicly holding themselves out as platforms to bring people together or expand the world's knowledge base, did exactly the opposite. They created echo chambers; They targeted and took advantage of peoples' worst impulses and negative emotions; They molded and shaped extremists through manipulation and addiction; They caused people to find and fit in "in groups" and grossly "otherize" "out groups" leading to or exacerbating tribalism and extremism; and they did so knowing it was tearing the fabric of society apart for profit, was amplifying and giving credibility to misinformation and dangerous rhetoric, and was turning those on the fringes of society into – in some cases, most notably Roof – violent powder kegs.

106.    Facebook, *a la* the Google Defendants (as detailed above), has long been aware that hateful, outraged, and politically extreme content is oxygen to the company's blood. The more horrendous the content, the more it generates *engagement* (a measure of user interaction with content on the system – "likes," "shares," comments, etc.). As Facebook has determined through years of study and analysis: hate and toxicity fuel its growth far more effectively than updates about a user's favorite type of latte.

107.    Rather than using what it has learned to change its practices, Facebook made a corporate decision to exploit the hate. The Meta Defendants, again much the same as the Google Defendants, designed algorithms to proactively exploit this opportunity, prioritizing divisive and polarizing content, including hate speech and misinformation about racial groups/minorities, especially when delivering content to users and recommending that users make new connections or join new groups.

108.    Facebook, knowing the toxic potential of such content, including hate speech and misinformation, nonetheless promoted its dissemination to those most likely to engage with it and most likely to be influenced by it. By ensuring that more users see and respond—in the form of likes, shares, and comments—to such toxic content, Facebook's algorithms train users to post more hate speech and misinformation to garner more attention online. Effectively, Facebook engages in a form of mind control, not just enforcing already-held views of users but actually modifying, molding, and evolving those views both qualitatively and quantitatively (*i.e.*, making already-held ideas more extreme and developing new ideas in users they would not have otherwise developed).

109.    "Even though [Facebook executives] don't have any animus toward people of color, their actions are on the side of racists," said Tatenda Musapatike, a former Facebook manager working on political ads and CEO of the Voter Formation Project. The reality has been that Facebook's decisions in the name of being neutral and race-blind in fact come at the expense of minorities and particularly people of color and Facebook knows this. Many of the business decisions made by Facebook in favor of sales led to instituting half-measures which left minorities more likely to encounter derogatory and racist language on Facebook and reinforced racial divides. Civil rights groups have long claimed that Facebook's algorithms and policies had a disproportional negative impact on minorities, and particularly Black users.

110.    Again, much the same as the Google Defendants (as described above), the business practices of Facebook in 2014 and 2015 prior to the death of the Rev. Pinckney violated the Civil Rights of African Americans including those souls who died in the Church. Facebook executives knew this but withheld disclosure to civil rights leaders. Even the independent civil rights auditors Facebook leadership hired in 2018 to conduct a major study of racial issues on its platform revealed that they were not informed of the internal research showing the company's algorithms

disproportionally harmed minorities. Laura Murphy, president of Laura Murphy and Associates, who led the civil rights audit process, said Facebook told her that "the company does not capture data as to the protected group(s) against whom the hate speech was directed."  "I am not asserting nefarious intent, but it is deeply concerning that metrics that showed the disproportionate impact of hate directed at Black, Jewish, Muslim, Arab and LGBTQIA users were not shared with the auditors," Murphy said in a statement. "Clearly, they have collected some data along these lines." The final report on the audit concluded that Facebook's policy decisions were a "tremendous setback" for civil rights.

111.    This growth-at-all-costs view of Facebook's business (or Google's business, as described above, particularly from the lips of former CEO Eric Schmidt himself) is not speculative, nor, for that matter, inconsistent with Facebook's view of itself. Facebook's Borg-like march toward further growth was best captured by one of its highest-ranking executives, Andrew Bosworth, in an internal memo circulated after a shooting death in Chicago was stunningly live-streamed on Facebook. It stated, in part:

> We connect people. That can be good if they make it positive. Maybe someone finds love. Maybe it even saves the life of someone on the brink of suicide. So we connect more people. That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a terrorist attack coordinated on our tools. And still we connect people. The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is *de facto* good… That's why all the work we do in growth is justified. All the questionable contact importing practices. All the subtle language that helps people stay searchable by friends. All of the work we do to bring more communication in. The work we will likely have to do in China some day. All of it. The natural state of the world is not connected. It is not unified. It is fragmented by borders, languages, and increasingly by different products. The best products don't win. The ones everyone use win. In almost all of our work, we have to answer hard questions about what we believe. We have to justify the metrics and make sure they aren't losing out on a bigger

picture. But connecting people. That's our imperative. Because that's what we do. We connect people.[9]

112.    In other words, at best, Facebook sees itself as an amoral actor on the world stage, with the sole objective of growth under the guise of connecting people regardless of the impact to users or the world more generally. Facebook's history, that around its role in the proliferation of white supremacist and anti-black racist content (despite the mounting evidence and knowledge that Facebook was directly fostering real world hate crimes and violence), have made it abundantly clear that Facebook's path to promote the very worst of humanity was not the result of a bug, but rather a carefully designed feature.[10] Again, as for the Google Defendants' part, Eric Schmidt is the one who said the no-longer-so-well-kept secret part out loud.

113.    Facebook has jealously hidden information about internal studies it has conducted, about the inner workings of its algorithms and how they are designed (and for what purposes they are designed), about the extent of individual user data collected, and about its knowledge of the harm it has caused or contributed to for the sake of profit. But in part through revelations from whistleblowers and former insiders, we now know Facebook and YouTube/Google have consciously disregarded evidence that the design of their platforms/products and their overall business strategies have directly fostered and enhanced real world harm of all shapes and sizes:

---

[9] Ryan Mac, *Growth At Any Cost: Top Facebook Executive Defended Data Collection In 2016 Memo — And Warned That Facebook Could Get People Killed*, BUZZFEED https://www.buzzfeednews.com/article/ryanmac/growth-at-any-cost-top-facebook-executive-defended-data.

[10] Mr. Bosworth was not terminated for the bald and bold revelation Facebook has long prioritized and will continue to prioritize growth and profits over safety (i.e., for saying the secret part out loud), but has rather since been placed in charge of (and is a chief spokesman for) arguably the company's largest and most aggressive expansion ever: the "Metaverse." *See* Kurt Wagner, *Who's Building Facebook's Metaverse? Meet CTO Andrew Bosworth*, BLOOMBERG (Oct. 27, 2021), https://www.bloomberg.com/news/articles/2021-10-27/facebook-fb-new-cto-andrew-bosworth-is-the-man-building-the-metaverse.

from genocide and unrest in foreign countries (and domestically) and enhancement of government propaganda efforts, to human trafficking and child abuse and predation, to white supremacist violence, and to a wide variety of mental health issues in our most vulnerable populations (the youth, particularly vulnerable teenage girls).

114.    Disturbingly, whistleblower Frances Haugen established that Facebook's own internal research showed that the more teenagers had negative thoughts and emotions, the more they used the app, so it did nothing to protect the millions of children viewing its content daily. Facebook's blind eye to the proliferation of white supremacist hate on its site has been similarly ignored, knowingly, for the sake of profit.

115.    The clear underlying message of the Bosworth memo above, as well as these examples in the preceding paragraph, is one of sacrifice for the sole purpose of the Social Media Defendants' growth: sacrifice of the victims of terrorist attacks and genocide; sacrifice of innocent children who take their own lives because of bullying and depression cultivated in large part on Facebook; sacrifice of the sexually vulnerable to predators; sacrifice of the mental and physical health of both children and adults alike; and, as described here, sacrifice of civil rights, freedoms, and security of racial minority communities.

116.    Because its algorithms recommend that susceptible users join extremist groups, where users are conditioned to post even more inflammatory and divisive content, Facebook is naturally open to exploitation by white supremacist groups and racial hate-mongers.

117.    Roof did not just find but was directed first by Google (as described above) and then by Facebook, based on its algorithms' knowledge of Roof's engagement on the internet (both on and off of Facebook), to groups or communities in which his views were cultivated, developed and made more extreme, ultimately taking Roof off of the internet and into the real world to

commit violence (an eminently foreseeable result from the Social Media Defendants' perspective, just one they were willing to tolerate/risk).

118.    It was clearly foreseeable, and indeed known to these Defendants, specifically Facebook and YouTube, that by prioritizing and rewarding users for posting dangerous and harmful content online—as well as by recommending extremist groups to those perceived susceptible to such messaging—their products would radicalize users like Roof, causing them to support or engage in dangerous or harmful conduct in the offline world. Furthermore, many Facebook users obtain their news from Facebook rather than the traditional sources on television or radio. The news content that the user sees on Facebook then tends to reaffirm harmful content while not balancing that content with differing views due to the algorithm's preference for continuously reengaging the user with more divisive content.

119.    Despite having been repeatedly alerted to their own role in the proliferation of white supremacist content, misinformation, and hate speech on their platforms, and despite the violent manifestations that have occurred across the U.S. and abroad, the Social Media Defendants have done little to adequately address the problem or change their business models. At bottom, they have consciously embraced these results because, good or bad, they drive the bottom line.

120.    In one functionally similar situation (Facebook's role in the Rohingya genocide in Burma), Facebook has even now admitted, albeit meekly, seemingly without any resulting action taken and in quite too-little-too-late fashion, "we weren't doing enough to help prevent our platform from being used to foment division and incite offline violence. We agree that we can and should do more."[11] Plaintiff agrees, both from a moral standpoint and from the standpoint of

---

[11] *See* Alex Warotka, *An Independent Assessment of the Human Rights Impact of Facebook in Myanmar*, FACEBOOK NEWSROOM (Nov. 5, 2018), https://about.fb.com/news/2018/11/myanmar-hria/.

Facebook's legal duty to prevent and/or warn about the foreseeable risk of harm knowingly created by its product. Same goes for Google/YouTube.

121.    We have heard "[Facebook] can and should do more" so often now that it can and should be considered an unofficial Facebook slogan. Unfortunately, these are empty words. Facebook's actions speak far louder than its rhetoric. The actions show Facebook has never desisted from its relentless growth-at-all-costs strategy. For instance, "doing more" apparently has centered around the launch of the virtual reality centric "Metaverse" to further force Facebook into the lives of billions. As noted by prominent political commentator Dan Pfeiffer: "Facebook is one of the least liked, least trusted companies on the planet. They are in the middle of a massive scandal about their involvement in genocide, human trafficking, and disinformation. And their next move is to say: 'What if you could live inside Facebook?'"[12] As noted above, the Google Defendants have similarly ignored any voices raising the moral red flag. They too have been completely unwilling to ameliorate any harm (including generation of racial hate and violence) that might pose even the slightest threat to growth of user engagement.

122.    Ms. Haugen testified indictingly "[t]he company's leadership knows how to make Facebook and Instagram safer but won't make the necessary changes because they have put their astronomical profits before people."[13] For our purposes, the subtext of this stunning statement is Facebook's design and very business strategy is responsible, in whole or in part, for the harm. *I.e.*

---

[12] *See* @DanPfeiffer, TWITTER (Oct. 28, 2021, 3:24 PM),
https//twitter.com/danpfeiffer/status/1453819894487674899.
[13] Abram Brown, *Facebook 'Puts Astronomical Profits Over People,' Whistle-Blower Tells Congress*, FORBES (Oct. 5, 2021),
https://www.forbes.com/sites/abrambrown/2021/10/05/facebook-will-likely-resume-work-on-instagram-for-kids-whistleblower-tells-congress/?sh=7385d0f74cda.

Facebook is not just a passive conduit of third-party content that sometimes results in harm. Facebook is the harm. Facebook knows how to fix the product yet it consciously decides not to.

123.    The hate Facebook fuels abroad as a byproduct of its business[14] is no different from the hate it fuels in the U.S. Megalomaniacally, despite already being cemented as one of the richest, most powerful entities in the world, Facebook has proven willing to trade social and racial harmony in the U.S. for more money/market control. There seems to be one constant whenever hatred online boils over into real world violence: Facebook engagement as a starting or turning point.

124.    Emboldened by the so-called liability shield of the Communications Decency Act's ill-applied Section 230, and despite knowledge of and the tools to stop or curtail the proliferation of white supremacist hate on its platform and violence offline, Facebook has never altered course. That is because Facebook, from the moment its monetization strategy was established onward, has had blinders on to any real calculation of the benefits to itself compared to the negative impacts it has on anyone else. Facebook is like a robot programmed with a singular mission: to grow. And the undeniable reality is Facebook's growth is fueled by the very hate, division and misinformation that caused Roof to, so they say, "self-radicalize" online. Plaintiff contends this term mischaracterizes what happens when disaffected and impressionable youth and Facebook mix (or such youth and Google/YouTube mix).

---

[14] As noted, Facebook essentially admitted negligence at least with respect to its role in the Rohingya genocide, but true to form, per Haugen, Facebook is right back at it in Ethiopia, where acts of ethnic violence are being carried out against the Tigrayan minority amidst a raging civil war, again with the help of Facebook-fueled misinformation and hate speech. *Facebook is under new scrutiny for it's role in Ethiopia's conflict*, NPR (10/11/21), https://www.npr.org/2021/10/11/1045084676/facebook-is-under-new-scrutiny-for-its-role-in-ethiopias-conflict; *see also* Mark Scott, *Facebook did little to moderate posts in the world's most violent countries*, POLITICO (Oct. 25, 2021), https://www.politico.com/news/2021/10/25/facebook-moderate-posts-violent-countries-517050.

125.    Facebook and Google/YouTube are not alone—other tech companies employ similar algorithms and the self-same obviously harmful monetization strategy (selling ads by addicting users to content and how it is delivered). These companies also share data and learn from each other about their mutual users causing the perfect storm for user data mining and manipulation for profit. Users, like Roof, are algorithmically led to content on Google/YouTube and content, connections or groups on Facebook who lead them to sites, ads, videos, search engines (or vice versa) that all reinforce one another and, in so doing, deepen the target user's beliefs and drive the target user to ever more extreme levels. This is all by design, product design to be exact.

**A. Youtube's defective design and inherent, intentional propensity to promote and foster extremism and racial animus.**

126.    The Google Defendants engineer algorithms to recommend videos to YouTube users.

127.    YouTube began building its algorithms in 2008.[15] The goal was to maximize how long users spent watching YouTube videos.[16]

128.    These algorithms select videos that populate the YouTube homepage, rank results in user searches, and push videos for viewers to watch through the "Up Next" feature.

129.    Google/YouTube designed its algorithms to manipulate users and induce them to use YouTube excessively and, as detailed above, a big part of this engagement-driving strategy involved pushing extreme content or ideology to certain users or based on certain searches or a

---

[15] Cristos Goodrow, *On YouTube's Recommendation System,* YouTube (Sept. 15, 2021), https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

[16] Ben Popken, *As Algorithms Take Over, YouTube's Recommendations Highlight a Human Problem*, NBC (Apr. 19, 2018), https://www.nbcnews.com/tech/social-media/algorithms-take-over-youtube-s-recommendations-highlight-human-problem-n867596.

combination of both (as well as potentially many other factors at this time known only internally within the Google Defendants' organization).

130.    A former YouTube engineer, Guillaume Chaslot, explained that when he designed YouTube's algorithm, YouTube wanted to optimize for one key metric: "watch time."[17] He elaborated that "[i]ncreasing users' watch time is good for YouTube's business model" because it increases advertising revenue; he also described how they knew this design of the platform was leading to the proliferation of conspiracy theories.[18]

131.    In 2012, the YouTube Head of Content Creator Communications similarly explained: "When we suggest videos, we focus on those that increase the amount of time that the viewer will spend watching videos on YouTube, not only on the next view, but also successive views thereafter."[19]

132.    By 2015/2016, the Google Defendants' algorithm was using deep-learning neural networks, a type of software that returns outputs based on data fed into it.[20] It is constantly evolving, learning every day from information collected specific to each user such as watch and

---

[17] William Turton, *How YouTube's Algorithm Prioritizes Conspiracy Theories*, Vice (Mar. 5, 2018), https://www.vice.com/en/article/d3w9ja/how-youtubes-algorithm-prioritizes-conspiracy-theories.

[18] Jesselyn Cook & Sebastian Murdock, *YouTube Is a Pedophile's Paradise*, Huffington Post (Mar. 20, 2020), https://www.huffpost.com/entry/youtube-pedophile-paradise_n_5e5d79d1c5b6732f50e6b4db; and Turton, fn. 17, *supra*.

[19] Eric Meyerson, *YouTube Now: Why We Focus on Watch Time,* YouTube (Aug. 10, 2012), https://blog.youtube/news-and-events/youtube-now-why-we-focus-on-watch-time/.

[20] *See* Paul Covington et al., *Deep Neural networks for YouTube Recommendations*, Google (2016), https://storage.googleapis.com/pub-tools-public-publication-data/pdf/45530.pdf.

search history, clicks, watchtime, sharing, likes and dislikes, etc, as well as user demographic information like age and gender.

133.    The Google Defendants' algorithm also "uses data from your Google Account activity to influence your recommendations."[21]

134.    Over time, increasingly by 2015 after incorporating AI, first through a system called "Sibyl" and then the more refined "Google Brain" in 2015 that "employs a technique known as unsupervised learning: its algorithms can find relationships between different inputs that software engineers never would have guessed" i.e., "patterns that are less obvious" identifying "adjacent relationships" of "similar but not exactly the same" content.[22] Over time, the algorithm became increasingly successful in getting users to watch recommended content. A large majority of the content viewed on YouTube is from recommendations the Google Defendants' algorithm pushed to them rather than videos identified by users through independent searches.

135.    The algorithm, over the years, has also kept users watching for increasingly longer periods. Teenage and young adult users are also known to be particularly susceptible to the very effective YouTube "rabbit hole" that has emerged over time and through serial tweaking of the platform, most notably, mimicking Facebook, through YouTube's institution of a similar tailored content-generating "Feed" systems.

136.    And as noted above, especially in the lead-up to the 2016 presidential election, the formula for engagement and profit growth that had emerged was "outrage equals attention," the

---

[21] Manage Your Recommendations and Search Results, Google, https://support.google.com/youtube/answer/6342839?hl=en&co=GENIE.Platform%3DAndroid.

[22] Casey Newton, *How YouTube Perfected the Feed,* Verge (Aug. 30, 2017), https://www.theverge.com/2017/8/30/16222850/youtube-google-brain-algorithm-video-recommendation-personalized-feed.

platform was foreseeably becoming a hotbed for fomenting extremism and hate, and this was all part of the underlying design of the product to be "an addiction engine."[23] One internal study by a company insider that went ignored showed white supremacist or "alt-right" content proliferation on YouTube was particularly successful due to the Google Defendants' algorithm's hate and outrage exploitation design.[24]

137.    The videos pushed out to users by the Google Defendants' "recommendation engine" are more likely to be addictive and are more likely to lead to harm because the algorithm recognizes sensationalist and fear-inducing content that drives users to further engagement with the product as signaling interest and preference (*see* fn. 7, *supra*).

138.    The Google Defendants' algorithm makes it more likely for the young and impressionable to encounter harmful content by pushing them down "rabbit holes" that lead them to increasingly mor extreme videos or topics, which then get them hooked. Creating an even more vicious cycle, YouTube's AI-driven "recommendation engine" first created in 2011 uses the users who get pushed down rabbit holes as *models* for the algorithm, which consequently emphasizes that harmful content, disproportionately pushing it to more users. That is, because the Google Defendants designed the algorithm to "maximize engagement," uncommonly engaged users become "models to be reproduced" thus the algorithms will "favor the content of such users," which is often more extreme.[25] This is straight from the mouth of the designer of this technology and former Google employee, Guillaume Chaslot.

---

[23] *See* Bergen, *supra*, at fn. 7.

[24] *See id.*

[25] *See* Guillaume Chaslot, *The Toxic Potential of YouTube's Feedback Loop*, Wired (Jul. 13, 2019), https://www.wired.com/story/the-toxic-potential-of-youtubes-feedback-loop/.

139.    The algorithm, per Chaslot, also makes extreme content less likely to get flagged or reported. As he explained, it becomes "more efficient" over time "at recommending specific user-targeted content, and as it improves, "it will be able to more precisely predict who is interested in [harmful or extreme] content" so "problems with the algorithm become exponentially harder to notice, as [harmful] content is unlikely to be flagged or reported."[26]

140.    Even though the Google Defendants knew or should have known of these risks to its users and to anyone who may be harmed by one of their radicalized or brain-washed users, they have never altered course nor have they have given any product warnings that foreseeable product use could cause these harms. And despite the mounting evidence their design and algorithms are causing myriad real world harm, the Google Defendants continue to manipulate users and compel them to use the products excessively, to enhance their bottom line. As a result, young people are confronted with more and more extreme videos, often resulting in significant harm.

## B.  Facebook's Defective Design and Architecture

141.    Facebook's design is defective in that its goal is to maximize *engagement*, a metric reflecting the amount of time a user spends and the amount of interaction the user has with any given content. For Facebook, engagement determines advertising revenue, which determines profits. "The prime directive of engagement … is driven by monetization. It befits a corporation aiming to accelerate growth, stimulate ad revenue, and generate profits for its shareholders."[27]

142.    In its SEC Form 10-K for the year ended December 31, 2012, Facebook warned:

> [I]f our users decrease their level of engagement with Facebook, our revenue, financial results, and business may be significantly harmed. The size of our user base and our users' level of engagement are critical to our success…. [O]ur business performance will become increasingly dependent

---

[26] *Id*.

[27] Luke Munn, *Angry by design: toxic communication and technical architectures*, HUMANIT SOC SCI COMMUN 7 (July 30, 2020), https://www.nature.com/articales/s41599-020-00550-7.

> on our ability to increase levels of user engagement and monetization.…
> Any decrease in user retention, growth, or engagement could render
> Facebook less attractive to developers and marketers, which may have a
> material and adverse impact on our revenue, business, financial condition,
> and results of operations. … Our advertising revenue could be adversely
> affected by a number of … factors, including: decreases in user engagement,
> including time spent on Facebook[.][28]

143.    Facebook intentionally incorporated engagement-based ranking of content into its system/algorithms. The News Feed—the first thing users see when opening the app/site and "the center of the Facebook experience"—is driven by engagement. Posts with higher engagement scores are included/prioritized, while posts with lower scores are buried/excluded. "[T]he Feed's… logics can be understood through a design decision to elevate and amplify 'engaging' content.… [T]he core logic of engagement remains baked into the design of the Feed at a deep level."[29]

144.    Facebook engineers and data scientists meet regularly to assess the billions of likes, comments, and clicks Facebook users make every day to "divine ways to make us like, comment and click more," so users will keep coming back and seeing more ads from the company's 2 million advertisers. Engineers are continually running experiments with a small share of Facebook users to boost engagement.[30] Thus, Facebook's design was the "result of particular decisions made over time.… Every area has undergone meticulous scrutiny… by teams of developers and designers.… [Facebook] has evolved through conscious decisions in response to a particular set of priorities."[31]

---

[28] U.S. Sec. and Exchange Commission Form 10-K, Facebook, Inc. (fiscal year ended Dec. 31, 2012) ("Facebook 2012 10-K") at 13, 14, https://www.sec.gov/Archives/edgar/data/1326801/000132680113000003/fb-12312012x10k.htm#s5D6A63A4BB6B6A7AD01CD7A5A25638E4.

[29] Munn, *Angry by design* (*see* fn. 27, *supra*).

[30] Victor Luckerson, *Here's How Facebook's News Feed Actually Works*, TIME (July 9, 2015), https://time.com/collection-post/3950525/facebook-news-feed-algorithm/.

[31] Munn, *Angry by design* (*see* fn. 27, *supra*)

145.    Facebook has also consistently promoted and rewarded employees who contribute to growth through a relentless focus on increase of Facebook's user base; employees who raise ethical and safety concerns tend to be ignored and marginalized and eventually leave the company.[32]

### 1. Facebook prioritizes hate speech and misinformation to increase user engagement.

146.    Facebook knows that the most negative emotions—fear, anger, hate—are the most engaging. Facebook employs psychologists and social scientists as "user researchers" to analyze its users' behavior in response to online content. An internal Facebook presentation by one such researcher, leaked in May 2020, warned: "Our algorithms exploit the human brain's attraction to divisiveness. … If left unchecked, … [Facebook would feed users] more and more divisive content in an effort to gain user attention [and] increase time on the platform."[33]

147.    To maximize engagement, Facebook does not merely fill users' News Feeds with disproportionate amounts of hate speech and misinformation. It employs a system of social rewards that manipulate and train users to create such content. When users post content, other users who are shown that content are prompted to "like," "comment" on, or "share" it. Under each piece of content, users can see how many times others have done so and can read the comments.

---

[32] Katie Canales, *'Increasingly gaslit': See the messages concerned Facebook employees wrote as they left the company*, BUSINESS INSIDER (Oct. 28, 2021), https://www.businessinsider.com/facebook-papers-employees-departure-badge-post-gaslit-burned-out-2021-10 ("[t]he employee said Facebook's infamous growth-first approach leads to rolling out 'risky features.' If employees propose reversing that risk, they're seen as being 'growth-negative, and veto'd by decision makers on those grounds,' they said. They also said it's difficult to establish 'win/wins,' or to roll out features that promote both safety and growth").

[33] Horwitz, Seetharaman, *Facebook Execs Shut Down Efforts to Make the Site Less Divisive*, WSJ (May 26, 2020), https://www.wsj.com/articles/facebook-knows-it-encourages-division-top-executives-nixed-solutions-11590507499

148.    A study published in February 2021 confirmed: "[i]n online social media platforms, feedback on one's behavior often comes in the form of a 'like'—a signal of approval from another user regarding one's post" and tested the assumption that likes "function as a social reward."[34]

149.    Roger McNamee, an early investor in Facebook and advisor to Mark Zuckerberg, wrote in his New York Times bestseller, "Zucked: Waking Up to the Facebook Catastrophe":

> Getting a user outraged, anxious, or afraid is a powerful way to increase engagement. Anxious and fearful users check the site more frequently. Outraged users share more content to let other people know what they should also be outraged about. Best of all from Facebook's perspective, outraged or fearful users in an emotionally hijacked state become more reactive to further emotionally charged content. It is easy to imagine how inflammatory content would accelerate the heart rate and trigger dopamine hits.[35]

150.    A Nature article published in 2020 further explained:

> [I]ncendiary, polarizing posts consistently achieve high engagement…. This content is meant to draw engagement, to provide a reaction….

> This divisive material often has a strong moral charge. It takes a controversial topic and establishes two sharply opposed camps, championing one group while condemning the other. These are the headlines and imagery that leap out at a user as they scroll past, forcing them to come to a halt. This offensive material hits a nerve, inducing a feeling of disgust or outrage. "Emotional reactions like outrage are strong indicators of engagement…. [T]his kind of divisive content will be shown first, because it captures more attention than other types of content." …

> The design of Facebook means that … forwarding and redistribution is only a few clicks away…. Moreover, the networked nature of social media amplifies this single response, distributing it to hundreds of friends and acquaintances. They too receive this incendiary content and they too share, inducing … "outrage cascades— viral explosions of moral judgment and disgust." Outrage does not just remain

---

[34] Björn Lindström *et al*., *A computational reward learning account of social media engagement*, NATURE COMMUNICATIONS 12, Art. No. 1311 (Feb. 26, 2021), https://www.nature.com/articles/s41467-020-19607-x#:~:text=%20A%20computational%20reward%20learning%20account%20of%20social,our%20hypothesis%20that%20online%20social%20behavior%2C...%20more%20.

[35] Roger McNamee, *Zucked: Waking Up to the Facebook Catastrophe*, at 88 (Penguin 2020 ed.).

constrained to a single user, but proliferates, spilling out to provoke other users and appear in other online environments.[36]

151.    Facebook knew it could increase engagement and the length of time users spend on its websites (and thus increase its revenue) by adjusting its algorithms to manipulate users' News Feeds and show them more negative content, particularly tailored based on the user's tendencies (no two users' News Feeds are the same), thus causing "massive-scale emotional contagion."

152.    In 2014, Adam Kramer, a member of Facebook's "Core Data Science Team," co-authored an article about one of the experiments Facebook conducted on its own users, stating:

> [W]e test whether emotional contagion occurs outside of in-person interaction between individuals by reducing the amount of emotional content in the News Feed … Which content is shown or omitted in the News Feed is determined via a ranking algorithm that Facebook continually develops and tests in the interest of showing viewers the content they will find most relevant and engaging. One such test is reported in this study: A test of whether posts with emotional content are more engaging.
>
> * * *
>
> The results show emotional contagion…. [F]or people who had positive content reduced in their News Feed, a larger percentage of words in people's status updates were negative and a smaller percentage were positive ...
> These results indicate that emotions expressed by others on Facebook influence our own emotions, constituting experimental evidence for massive-scale contagion via social networks.[37]

153.    Independent research unequivocally confirms that fake content thrives on Facebook over reliable and trustworthy sources. In September 2021, the Washington *Post* reported on a "forthcoming peer-reviewed study by researchers at New York University and the Université Grenoble Alpes in France [which] found that from August 2020 to January 2021, news publishers

---

[36] Munn, *Angry by design* (*see* fn. 27, *supra*).

[37] Adam D.I. Kramer et al., *Experimental evidence of massive-scale emotional contagion through social networks*, 111 PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES, no. 29 (June 17, 2014), https://www.pnas.org/cgi/doi/10.1073/pnas.1320040111.

known for putting out misinformation got six times the amount of likes, shares, and interactions on the [Facebook] platform as did trustworthy news sources …"[38]

154.     In testimony before Congress in September 2020, Tim Kendall, Facebook's first Director of Monetization—likening Facebook's business model to that of Big Tobacco—explained how such content makes Facebook addictive:

> At Facebook, I believe we sought to mine as much human attention as possible and turn it into historically unprecedented profits. To do this, we didn't simply create something useful and fun; we took a page from Big Tobacco's playbook, working to make our offering addictive at the outset….
>
> The next page in Big Tobacco's playbook was to add bronchodilators to cigarettes. This allowed the smoke to get in contact with more surface area of the lungs. Allowing for misinformation, conspiracy theories, and fake news to flourish were Facebook's bronchodilators.
>
> But that incendiary content wasn't enough. Tobacco companies then added ammonia to cigarettes to increase the speed with which nicotine traveled to the brain. Facebook's ability to deliver this incendiary content to the right person, at the right time, in the exact right way—through their algorithms—that is their ammonia. And we now know it fosters tribalism and division. Social media preys on the most primal parts of your brain; it provokes, it shocks, and it enrages….
> Facebook and their cohorts worship at the altar of engagement and cast other concerns aside, raising the voices of division, anger, hate, and misinformation to drown out the voices of truth, justice, morality, and peace.[39]

155.     Content attacking opposing groups is particularly engaging. Zeynep Tufekci, a sociologist at the University of North Carolina, has written:

> [T]he new, algorithmic gatekeepers aren't merely (as they like to believe) neutral conduits for both truth and falsehood. They make their money by keeping people on their sites and apps; that aligns their incentives closely with those who stoke outrage, spread misinformation, and appeal to people's existing biases and preferences.

---

[38] Elizabeth Dwoskin, *Misinformation on Facebook got six times more clicks than factual news during the 2020 election, study says*, WASHINGTON POST (Sept. 4, 2021), https://www.washingtonpost.com/technology/2021/09/03/facebook-misinformation-nyu-study/.

[39] *Mainstreaming Extremism: Social Media's Role in Radicalizing America: Hearing before the House Subcommittee on Consumer Protection and Commerce*, 116th Congress (Sept. 24, 2020) (statement of Timothy Kendall).

> [T]he problem is that when we encounter opposing views in the age and context of social media, it's not like reading them in a newspaper while sitting alone. It's like hearing them from the opposing team while sitting with our fellow fans in a football stadium. Online, we're connected with our communities, and we seek approval from our like-minded peers. We bond with our team by yelling at the fans of the other one. In sociology terms, we strengthen our feeling of "in-group" belonging by increasing our distance from and tension with the "out-group"—us versus them…. This is why the various projects for fact-checking claims in the news, while valuable, don't convince people. Belonging is stronger than facts.[40]

156.    A study published in June 2021 showed that posts attacking "others" (the "out-group") are particularly effective at generating social rewards, such as likes, shares, and comments, and that those reactions consist largely of expressions of anger:

> We investigated whether out-group animosity was particularly successful at generating engagement on two of the largest social media platforms: Facebook and Twitter. Analyzing posts from news media accounts and US congressional members (n = 2,730,215), we found that posts about the political out-group were shared or retweeted about twice as often as posts about the in- group…. Out-group language consistently emerged as the strongest predictor of shares and retweets…. Language about the out-group was a very strong predictor of "angry" reactions (the most popular reactions across all datasets)…. In sum, out-group language is the strongest predictor of social media engagement across all relevant predictors measured, suggesting that social media may be creating perverse incentives for content expressing out-group animosity.[41]

157.    It is all too apparent to Facebook users in the United States that Facebook exploits the black-white racial divide in this Country relentlessly; and it is all too common for such users to deactivate or delete Facebook from time to time because of feelings of negativity and anger

---

[40] Tufekci, *How social media took us from Tahrir Square to Donald Trump*, MIT TECH REVIEW (Aug. 14, 2018), https://technologyreview.com/2018/08/14/240325/how-social-media-took-us-from-tahrir-square-to-donald-trump

[41] Steve Rathje et al, *Out-group animosity drives engagement on social media*, 118 PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES 26 (June 29, 2021), https://doi.org/10.1073/pnas.2024292118.

from the constant barrage of such content they experience. But, as Facebook well knows, the addiction Facebook fosters usually brings them back at some point.

158.    Another study, published in August 2021, analyzed how "quantifiable social feedback (in the form of 'likes' and 'shares')" affected the amount of "moral outrage" expressed in subsequent posts. It "found that daily outrage expression was significantly and positively associated with the amount of social feedback received for the previous day's outrage expression." The amount of social feedback is, in turn, determined by the underlying algorithms:

> Social media newsfeed algorithms can directly affect how much social feedback a given post receives by determining how many other users are exposed to that post. Because we show here that social feedback affects users' outrage expressions over time, this suggests that newsfeed algorithms can influence users' moral behaviors by exploiting their natural tendencies for reinforcement learning…. [D]esign choices aimed at … profit maximization via user engagement can indirectly affect moral behavior because outrage-provoking content draws high engagement….[42]

159.    In other words, if a user makes two posts—one containing hateful, outraged, and divisive content and one without—Facebook's algorithms will show the hateful, outraged, and divisive post to more users. Consequently, the hateful, outraged, and divisive post is rewarded with more likes, shares, and comments. The user quickly learns that to obtain a reaction to his or her posts, he or she should incorporate as much hateful, outraged, and divisive content as possible.

160.    On October 5, 2021, Whistleblower Haugen testified before Congress:

> The dangers of engagement-based ranking are that Facebook knows that content that elicits an extreme reaction from you is more likely to get a click, a comment or reshare. And it's interesting because those clicks and comments and reshares aren't even necessarily for your benefit, it's because they know that other people will produce more content if they get the likes and comments and reshares. They prioritize content in your feed so that you will give little hits of dopamine to your

---

[42] William J. Brady et al., *How social learning amplifies moral outrage expression in online social networks*, 7 SCIENCE ADVANCES, no. 33 (Aug. 13, 2021), https://www.science.org/doi/10.1126/sciadv.abe5641. Posts were classified as either containing moral outrage or not by using machine learning.

friends, so they will create more content. And they have run experiments on people, producer side experiments, where they have confirmed this.[43]

161.    Recently leaked documents confirmed Facebook's ability to determine the type of content users post through its algorithms. After modifying its algorithms to boost engagement in 2018, "[t]he most divisive content that publishers produced was going viral on the platform … creating an incentive to produce more of it…. Company researchers discovered that publishers and political parties were reorienting their posts toward outrage and sensationalism. That tactic produced high levels of comments and reactions that translated into success on Facebook." Facebook researchers further discovered "the new algorithm's heavy weighting of reshared material in its News Feed made the angry voices louder. 'Misinformation, toxicity, and violent content are inordinately prevalent among reshares,' researchers noted in internal memos." Facebook data scientists suggested "a number of potential changes to curb the tendency of the overhauled algorithm to reward outrage and lies" but "Mr. Zuckerberg resisted some of the proposed fixes, the documents show, because he was worried they might hurt the company's other objective—making users engage more with Facebook."[44]

162.    In October 2021, NBC News, based on internal documents leaked by Haugen, described an experiment in which an account created by Facebook researchers experienced "a barrage of extreme, conspiratorial, and graphic content" even though the fictitious user had never expressed interest in such content. For years, Facebook "researchers had been running [similar]

---

[43] *Facebook Whistleblower Frances Haugen Testifies on Children & Social Media Use: Full Senate Hearing Transcript*, REV (Oct. 5, 2021), https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript.

[44] Keach Hagey, Jeff Horwitz, *Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead*, WSJ (Sept. 15, 2021), https://www.wsj.com/articles/facebook-algorithm-change-zuckerberg-11631654215.

experiments… to gauge the platform's hand in radicalizing users," and among Haugen's disclosures are "research, reports and internal posts that suggest Facebook has long known its algorithms and recommendation systems push some users to extremes."[45]

163.    It is not surprising that the true nature of Facebook's algorithms has become fully apparent only through leaked documents and whistleblower testimony, since Facebook goes to great lengths to hinder outside academic research regarding the design of its algorithms. In a congressional hearing entitled "The Disinformation Black Box: Researching Social Media Data" on September 28, 2021, three social media researchers testified about Facebook's attempts to block their access to the data they needed:

- Laura Edelson of New York University testified: "this summer, Facebook cut off my team's access to their data. We used that very data to support the finding in our recent study that posts from misinformation sources on Facebook got six times more engagement than factual news during the 2020 elections, to identify multiple security and privacy vulnerabilities that we have reported to Facebook, and to audit Facebook's own, public-facing Ad Library for political ads."[46]

- Alan Mislove, a Professor of Computer Sciences at Northeastern University, testified: "Facebook recently criticized a study on misinformation by saying it focused on who engages with content and not who sees it—but that's only true because Facebook does not make such impression data available to researchers."[47]

---

[45] Brandy Zadrozny, *"Carol's Journey": What Facebook knew about how it radicalizes users*, NBC NEWS (Oct. 22, 2021), https://www.nbcnews.com/tech/tech-news/facebook-knew-radicalized-users-rcna3581.

[46] *Hearing on The Disinformation Black Box: Researching Social Media Data before the Subcomm. on Oversight*, 117th Cong. (2021) (testimony of Laura Edelson, NYU Cybersecurity for Democracy), https://www.congress.gov/117/meeting/house/114064/witnesses/HHRG-117-SY21-Wstate-EdelsonL-20210928.pdf.

[47] *Id*. (testimony of Alan Mislove, Professor of Computer Sciences at Northeastern University), https://www.congress.gov/117/meeting/house/114064/witnesses/HHRG-117-SY21-Wstate-MisloveA-20210928.pdf.

- Kevin T. Leicht, a Professor of Sociology at University of Illinois Urbana-Champaign testified: "there are limited amounts of social media data available due to company restrictions placed on that data. Many researchers fear litigation that may result from analyzing and publishing results from these data."[48]

164. On October 5, 2021, Haugen also testified before Congress:

[N]o one truly understands the destructive choices made by Facebook except Facebook….

A company with such frightening influence over so many people, over their deepest thoughts, feelings, and behavior, needs real oversight. But Facebook's closed design means it has no real oversight. Only Facebook knows how it personalizes your Feed for you.

At other large tech companies like Google, any independent researcher can download from the Internet the company's search results and write papers about what they find. And they do. But Facebook hides behind walls that keeps researchers and regulators from understanding the true dynamics of their system….[49]

165. Until recently, "Section 230" has been widely held to preclude one form of oversight – tort action. But thanks to whistleblowers like Ms. Haugen, we now know that Section 230 has no application to a suit such as this one. This suit (and others like it) does not seek to hold Facebook and Google/YouTube liable for third-party content. Instead, this action is directed to their own internal decisions about product design that they made despite acute knowledge of the unreasonable risks of harm their decisions were causing. Because of Ms. Haugen and other whistleblowers and former company insiders, Plaintiff can allege Facebook and Google/YouTube made conscious design decisions highly probable to drive users like Roof to racial violence.

---

[48] *Id*. (testimony of Kevin T. Leicht, Professor of Sociology at University of Illinois Urbana-Champaign), https://www.congress.gov/117/meeting/house/114064/witnesses/HHRG-117-SY21-Wstate-LeichtK-20210928.pdf.

[49] *See* fn. 40, *supra*.

166.    It is now clear that, by modifying the design of its algorithms and system, Facebook can and does influence and manipulate the quantity, substance, and emotional tone of the content its users produce. Through its dopamine-based incentive structure of social rewards and cues, as well as its algorithmic promotion of hate speech and misinformation, Facebook contributes to and participates in the development and creation of outraged, extreme, and divisive content.

167.    Alternatively, Facebook's design and architecture is a completely independent cause of harm from the content itself. The content could not possibly have the catastrophic real-world impact it does without Facebook's manipulation-by-design of users, as described herein.

168.    It's obviously not in Facebook's favor—especially its bottom line—to curb the spread of negative content and adjust its algorithm to promote positive content. One designer and technologist proposed four different interventions to address the "problems of polarization, dehumanization, and outrage, three of the most dangerous byproducts" of tools such as Facebook. The four interventions described include "Give Humanizing Prompts," "Picking out unhealthy content with better metrics," "Filter unhealthy content by default," and "Give users feed control." Facebook has not implemented any such interventions, undoubtedly because, as the author noted, the interventions "will all likely result in short-term reductions in engagement and ad revenue."[50]

169.    Facebook has options for moderating its algorithms' tendency to promote hate speech and misinformation (*i.e.*, alternative safer design options), but it rejects those options because the production of more engaging content takes precedence. In a September 2021 article, based on recently leaked internal documents, the Wall Street Journal described how Facebook had

---

[50] Tobias Rose-Stockwell, *Facebook's problems can be solved with design*, QUARTZ (Apr. 30, 2018) (emphases in original), https://qz.com/1264547/facebooks-problems-can-be-solved-with-design/.

modified its News Feed algorithm "to reverse [a] decline in comments, and other forms of engagement, and to encourage more original posting" by users.[51]

170.    It is clear—based largely on admissions from former Facebook executives—that Facebook's algorithms are not *neutral*. The algorithms do not merely recommend content based on users' previously expressed interests. Rather, to maximize engagement, they are heavily biased toward promoting content that will enrage, polarize, and radicalize users. Facebook does not simply "connect" people with similar interests; it exploits tribalism by actively herding people into groups that define themselves through their violent opposition to "other" people—often identified by race, religion, or political ideology.

### 2.    Facebook promotes extremist group content and weaponizes it against users.

91.    Facebook's algorithms curate and promote content that attracts new members to extremist groups. A presentation by a researcher employed at Facebook, which was leaked in 2020, showed that Facebook's algorithms were responsible for the growth of German extremist groups on the website: "The 2016 presentation states that '64% of all extremist group joins are due to our recommendation tools' and that most of the activity came from the platform's 'Groups You Should Join' and 'Discover' algorithms. 'Our recommendation systems grow the problem.'" Ultimately, however, because "combating polarization might come at the cost of lower engagement … Mr. Zuckerberg and other senior executives largely shelved the basic research … and weakened or blocked efforts to apply its conclusions to Facebook products."[52]

92.    Roger McNamee gave this example:

[I]f I am active in a Facebook Group associated with a conspiracy theory and then stop using the platform for a time, Facebook will do something surprising when I

---

[51] *See* Hagey, Horwitz, *Facebook Tried to Make Its Platform a Healthier Place* … (fn. 44, *supra*).
[52] Horwitz, Seetharaman, *Facebook Executives Shut Down Efforts ...* (fn. 33, *supra*).

return. It may suggest other conspiracy theory Groups to join…. And because conspiracy theory Groups are highly engaging, they are very likely to encourage reengagement with the platform. If you join the Group, the choice appears to be yours, but the reality is that Facebook planted the seed. It does so not because conspiracy theories are good for you but because conspiracy theories are good for them.[53]

171.    McNamee described how, in 2016, he had raised his concerns with Mark Zuckerberg and Sheryl Sandberg, to no avail.[54]

172.    In the August 2021 study discussed above, the authors stated: "[U]sers conform to the expressive norms of their social network, expressing more outrage when they are embedded in ideologically extreme networks where outrage expressions are more widespread…. Such norm learning processes, combined with social reinforcement learning, might encourage more moderate users to become less moderate over time, as they are repeatedly reinforced by their peers for expressing outrage."[55]

173.    Indeed, the positive feedback loop created by Facebook in the form of likes, comments, and shares drives user engagement with extremist content and rewards user participation in creating such content. Together with algorithms promoting hate speech, misinformation, and conspiracy theories, Facebook has steered users to extremist groups and trained those users to express more outrage.

**3.  Exploitation by extremists and Facebook's success in radicalizing its users.**

174.    Facebook has proven all too susceptible to exploitation by despotic governments and regimes abroad. But Facebook has also proven to be quite exploitable for white supremacists and extremists here in the U.S. (same architecture, just different bad actors). As McNamee wrote:

---

[53] McNamee, *Zucked* (fn. 35, *supra*) at 94-95.

[54] *Id*. at 4-7.

[55] *Brady* et al. (fn. 42, *supra*).

Facebook's culture, design goals, and business priorities made the platform an easy target for bad actors, which Facebook aggravated with algorithms and moderation policies that amplified extreme voices. The architecture and business model that make Facebook successful also make it dangerous. Economics drive the company to align—often unconsciously—with extremists and authoritarians to the detriment of democracy around the world.[56]

175.    By prioritizing hate speech and misinformation in users' News Feeds, maximizing engagement, training users to produce ever more extreme and outraged content, recommending extremist groups, and allowing its product to be exploited by extremist groups, Facebook radicalizes users and incites them to violence.

176.    As Chamath Palihapitiya, Facebook's former VP for User Growth, told an audience at Stanford Business School: "I think we have created tools that are ripping apart the social fabric of how society works … [t]he short-term, dopamine-driven feedback loops we've created are destroying how society works … No civil discourse, no cooperation[,] misinformation, mistruth. And it's not [just] an American problem…"[57]

177.    McNamee likewise explained how the design of Facebook's algorithms and system lead to real-world violence: "The design of Facebook trained users to unlock their emotions, to react without critical thought…. at Facebook's scale it enables emotional contagion, where emotions overwhelm reason…. Left unchecked, hate speech leads to violence, disinformation undermines democracy."[58]

---

[56] McNamee, *Zucked* (fn. 35, *supra*) at 232-33.

[57] James Vincent, *Former Facebook exec says social media is ripping apart society*, THE VERGE (Dec. 11, 2017), https://www.theverge.com/2017/12/11/16761016/former-facebook-exec-ripping-apart-society.

[58] McNamee, *Zucked* (fn. 35, *supra*) at 98, 233.

178.    As former Facebook privacy expert Dipayan Ghosh noted, "[w]e have set ethical red lines in society, but when you have a machine that prioritizes engagement, it will always be incentivized to cross those lines."[59]

179.    Facebook's tendency to cause real-world violence by radicalizing users online has been demonstrated time and time again. Beyond Roof's case, a couple more recent examples of real-world white nationalist violence incubated on Facebook include:

- In March 2019, a gunman killed 51 people at two mosques in Christchurch, New Zealand, while live-streaming the event on Facebook.[60] For two years prior to the shooting, the gunman had been active on the Facebook group of the Lads Society, an Australian extremist white nationalist group.[61]

- In August 2020, "[h]ours before a 17-year-old white man allegedly killed two people and injured a third at protests over a police shooting in Kenosha, Wisconsin, a local militia group posted a call on Facebook: 'Any patriots willing to take up arms and defend our city tonight from evil thugs?'"[62] Later, Mark Zuckerberg said that "the social media giant made a mistake by not removing a page and event that urged people in Kenosha … to carry weapons amid protests."[63]

---

[59] Frenkel & Kang, *An Ugly Truth: Inside Facebook's Battle for Domination*, at 185 (HarperCollins 2021).

[60] Charlotte Grahan-McLay, Austin Ramzy, and Daniel Victor, *Christchurch Mosque Shootings Were Partly Streamed on Facebook*, NEW YORK TIMES (Mar. 14, 2019), https://www.nytimes.com/2019/03/14/world/asia/christchurch-shooting-new-zealand.html.

[61] *Royal Commission of Inquiry into the Terrorist Attack on Christchurch Mosques on 15 March 2019* § 4.6, https://christchurchattack.royalcommission.nz/the-report/firearms-licensing/general-life-in-new-zealand/; Michael McGowan, *Australian white nationalists reveal plans to recruit 'disgruntled, white male population'*, THE GUARDIAN (Nov. 11, 2019), https://www.theguardian.com/australia-news/2019/nov/12/australian-white-nationalists-reveal-plans-to-recruit-disgruntled-white-male-population.

[62] Adam Mahoney, Lois Beckett, Julia Carrie Wong, Victoria Bekiempis, *Armed white men patrolling Kenosha protests organized on Facebook*, THE GUARDIAN (Aug. 26, 2020), https://www.theguardian.com/us-news/2020/aug/26/kenosha-militia-protest-shooting-facebook.

[63] Carlisle, *Mark Zuckerberg Says Facebook's Decision to Not Take Down Kenosha Militia Page Was a Mistake*, TIME (Aug. 29, 2020), https://time.com/5884804/mark-zuckerberg-facebook-kenosha-shooting-jacob-blake/.

- In May 2022, inspired by the same ideology and thinking that Roof was introduced to online ("Great Replacement Theory", "White Genocide", etc.), "an 18-year-old white male drove from his home in Conklin, NY, to a Tops Friendly Market on Buffalo's East Side, with the intention of 'killing as many blacks as possible.'" The New York Attorney General's Office investigated his online radicalization, focusing on Reddit, Discord, 4chan, 8kun as his main extreme/polarizing-content sources, but also referring to his use of Facebook, Instagram and YouTube. Moreover, the shooter himself cited the Christchurch shooter as his primary inspiration, thus, at the very least, the Buffalo shooter was a downstream effect of Facebook's role in radicalizing the Christchurch shooter.[64]

180.    Facebook well knew, long before Roof, that its platform was an incredibly effective disinformation and propaganda tool for extremist groups and bad actors across the spectrum, but most notably (for purposes of this case) white supremacists/nationalists and Russian state operatives. And Facebook well knew the design of its machinery aided and abetted these evil actors in their brainwashing and radicalizing of users, which would not be possible but for the ecosystem Facebook allows them to create and/or operate within.

### 4.   The Russian Defendants Use of Facebook [65]

181.    In addition to providing the tools for white supremacists to spread hate and radicalize, again by its very design, Facebook turned out to be the perfect tool for the Russian Defendants to exploit racial divisions in the United States for purposes of sowing discord, affecting U.S. elections, and violating the civil rights of Black Americans, among other protected classes. The amplification and propagation of hateful, extremist, and polarizing messages and the radicalization of users like Roof are inevitable results of the algorithms that Facebook intentionally

---

[64] Office of the NYAG, *Investigative Report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022* (Oct. 18, 2022), available at https://ag.ny.gov/sites/default/files/buffaloshooting-onlineplatformsreport.pdf.

[65] As noted above, the allegations in this section are largely supported by the materials cited in fns. 4 & 5, *supra*.

and meticulously built into its system. The extremists and the Russian Defendants, among others, saw the incredible potential to do harm that Facebook provided.

182.    The ORGANIZATION employed Sergey Pavlovich Polozov from April 2014 through October 2016. Polozov served as the manager of the IT department. In his role he oversaw the procurement of U.S. servers and other computer infrastructure that masked the ORGANIZATION's Russian location when conducting operations within the U.S. Anna Vladislavovna Bogacheva served on the "translator" project and oversaw the project's data analysis group.  She traveled to the U.S. to collect intelligence for the ORGANIZATION under false pretenses.

183.    The ORGANIZATION, starting in or around 2014, began an intelligence gathering program to inform U.S. Operations. The Russian Defendants and their co-conspirators began to track and study groups on U.S. social media sites dedicated to U.S. Politics and social issues. This was a sophisticated analysis that studied metrics like the group's size, the frequency of content placed by the group, the level of audience engagement with that content (likes, comments, shares, etc.). Defendants created hundreds of social media accounts and used them to develop certain fictitious U.S. personas and promoted them as leaders of public opinion in the U.S.

184.    This was a highly organized effort that included numerous employees labeled as specialists that were tasked to create social media accounts that appeared to be genuine U.S. persons. There was a day-shift team and a night-shift team so that posts could be made during the daytime in the U.S.  The work of the specialists was directed at creating divisiveness targeting on racial issues and oppositional social movements. The Russian Defendants and their co-conspirators created thematic group pages on social media sites focusing on Facebook and Instagram. Main

issues focused on the Black Lives Matter movement with a prolific group named "Blacktivist" and on immigration issues with groups such as "Secured Borders."

185.    Starting in early 2015, the Russian Defendants and their co-conspirators purchased advertisements on online social media sites to promote their plan to cause social and racial unrest in the U.S. They tracked the impact and the performance of their online social media operations. They continuously evaluated the content posted by their specialists to ensure they appeared authentic to U.S. social media users. To disguise their Russian identities the ORGANIZATION's IT department purchased space on servers located inside the U.S. to establish virtual private networks. This allowed unfettered access to online social media accounts and communication with real U.S. persons while masking the Russian origin and control of the activity from those, unlike Facebook (upon information and belief), lacking the savvy and the internal data to uncover the masking of these accounts and their connections.

186.    Russia essentially launched a covert influence campaign against the U.S. in 2014. This was done *via* the Russian Defendants but had clear ties to Russian Intelligence. "Covert influence campaigns don't create divisions on the ground, they amplify divisions on the ground," said Michael Hayden, who ran the NSA under Presidents Bill Clinton and George W. Bush and then became Director of the CIA. John Sipher, who ran the CIA's Russia desk during George W. Bush's first term, noted "before the Soviets would plant information in Indian papers and hope it would get picked up by our papers," but "now, because of the technology, you can jump right in."

187.    Russian interference in U.S. race relations goes all the way back to 1932 and the Scottsboro Boys, nine teenagers who were falsely accused of raping two white women in Alabama and were then wrongly convicted repeatedly by all-white Southern juries. A famous Russian propaganda poster artist, Dmitri Moor, created a poster that cried out "Freedom to the prisoners of

Scottsboro." The Communist party in Russia had a plan calling for recruitment of Southern Blacks and working toward establishing a separate Black State in the South as a way of introducing Communist revolution into the United States. This Soviet objective was to disrupt the United States by causing social unrest around racial tensions and to negatively affect U.S. international relations and to diminish U.S. power in the world while undermining the appeal of American democracy.

188.    After the death of Treyvon Martin in 2012 and the Ferguson unrest after the fatal shooting of Michael Brown in August of 2014, the Russian Intelligence services via these Russian Defendants saw an opportunity to cause discord by using American Social Media companies as a way to amplify and grow the racial unrest. Russian operatives released posts supporting law enforcement and criticizing young African American males and other posts denouncing the BLM Movement and belittling social justice reforms.  Some posts were even more extreme supporting White nationalist groups and calling for violence. This was a deliberate and well executed social media campaign designed to promote racial tensions and to undermine the social fabric of the U.S.

189.    The actions of the Russian Defendants were that of a sophisticated information operation taken on behalf of the Russian Government through these non-state actors to implant in the minds of Americans certain prejudices, beliefs and convictions to destabilize the social fabric of the country. Let there be no mistake, this was a deliberate and planned attack on the citizens of the U.S. in an effort to further destabilize our country by turning its people of different races against each other and by setting race relations on fire.

190.    The Civil Laws in the United States include human rights law that prohibit racial discrimination as well as incitement of violence based on race. The actions of these Defendants have implicated several human rights norms including freedom of thought, the right to hold

opinions without interference, to take part in the conduct of public affairs, and to participate freely in the electoral process.

191.    Facebook CEO Mark Zuckerberg has noted that social media offers a form of communication "where resonant messages get amplified many times."  In an era where social media offers a simple, direct, and instant method for reaching hundreds of millions of Americans, the implications of the actions of these Defendants to violate the Civil Rights of the Reverend Pinckney and the other American citizens murdered in their church cannot be left unpunished. Technological advances heighten this threat, and social media companies have responsibilities not to violate the Civil Rights of the citizens of the United States.

192.    Facebook's (and Google/YouTube's) defective algorithms, through their design, purposefully exploited hate and racial issues because such matters are strong drivers of user engagement. Facebook had some knowledge of these fraudulent accounts but did little to control, limit, or prevent the nefarious activities of the Russian Defendants. It was not until September of 2017 that Facebook publicly reported they had identified Russian expenditures on their platforms to fund social and political advertisements. The initial disclosure from Facebook on September 6th, 2017 included a statement that Facebook had "shared [its] findings with US authorities investigating these issues." Facebook had prior knowledge and knew that there were fake accounts that were coordinating activity among inauthentic and connected accounts in an effort to manipulate public opinion. Facebook describes this process as "false amplification." The large majority of the Facebook ads purchased by the Russian Defendants addressed race (55%).

193.    It is clear the Russian Defendants' social media campaign was designed to promote racial divisions in the U.S. Many Facebook and Instagram messages were drafted and disseminated with reference to race and were explicit in their focus on race. When all aspects of the Russian

Defendants' social media campaign are analyzed, it clearly violates the prohibitions against racial discrimination and intimidation. This campaign was specifically designed to "aggravate the conflict between minorities and the rest of the population" as disclosed in the Affidavit in Support of a Criminal Complaint in the United States of America v. Elena Alekseevna Khusyaynova.

**5. Dylann Roof's radicalization on Google/YouTube and Facebook.**

194.    As well detailed above in the Introduction and Factual Allegations sections of this Complaint, Roof's radicalization began with the results (or "hits") Google's algorithms, by design, chose to return in response to his search for "black on white crime." Moreover, upon information and belief, due to Google's control of YouTube and efforts to synergize content delivery to best induce engagement across the two platforms, it is more than likely Roof's radicalization also involved consumption of content fed to him, again by design, on YouTube that Plaintiff could not possibly know any further detail about without the benefit of discovery (since Google/YouTube do not make this data public).

195.    As further noted and detailed above, Facebook's algorithms likewise control what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Facebook concluded "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting "[t]his is an increasing liability." In other internal memos, Facebook concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent."

196.    Also as noted above, other documents show that Facebook employees also discussed Facebook's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Facebook's bottom line. Facebook found that the inflammatory content the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Facebook sell more of the digital ads

that generate most of its revenue. Google/YouTube, per former insiders and as detailed above, made similar conscious and affirmative decisions to amplify hate-filled and inflammatory content.

197.    All told, Facebook's algorithm (like Google/YouTube's) optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability. To put it in simple terms, for several years Facebook's algorithms sought to provide more violent and angry racially based content to those users the algorithm deemed likely to engage with race-related content. At Facebook, "[t]here was this soul-searching period after 2016 that seemed to me this period of really sincere, 'Oh man, what if we really did mess up the world?'" said Eli Pariser, co-director of Civic Signals, a project that aims to build healthier digital spaces, and who has spoken to Facebook officials about polarization.

198.    But fixing the algorithm polarization problem would have required Facebook to rethink some of its core products. Most notably Facebook, like Google/YouTube, would have to change its algorithm regarding how it prioritized "user engagement" and rewarded particular engagement that includes metrics involving time spent, likes, shares and comments that have always been the lodestar of its system.

199.    In 2016 Facebook researcher and sociologist Monica Lee found extremist content thriving in more than one-third of large German political groups on the platform. There was an abundant amount of racist, white supremacist conspiracy-minded and pro-Russian content.

200.    Analysis showed these Facebook groups were disproportionally influenced by a subset of hyperactive users that were mostly private or secret.

201.    Facebook itself realized in 2016 that its algorithms were responsible for the growth of extremism.  Further analysis by Facebook showed that "64% of all extremist group joins are

due to our recommendation tools." This included Facebook's "groups you should join" and "Discover" algorithms.

202.    In an effort to correct these product defects in its algorithms, engineers and researchers at Facebook were assigned to a cross-jurisdictional task force referred to as "Common Ground" and Facebook created new "Integrity Teams" embedded in all aspects of the company.

203.    One of the product defects with the algorithms that these teams worked on in 2017 and 2018 was how to limit the disproportionate influence on the algorithms from a small pool of hyperpartisan users. Under Facebook's engagement-based metrics, a hyperactive user who likes, shares or comments on 1,500 pieces of content has more influence on the platform and its algorithms than another user that interacts with just 15 posts.

204.    This allowed the Russian Defendants to achieve incredible social media presence by developing hyperactive users working in long shifts. This combined with the fact that Facebook developed its algorithms to target users with content precisely tailored to their interests resulted in very precise targeting (at scale) by the Russian Defendants of those that would engage with and/or act on their content.

205.     This was done in a way to enhance user engagement. Joachin Quinonero Candela, the former director of Artificial Intelligence (AI) at Facebook, was able to enhance algorithm performance by incorporating AI and Machine-learned algorithms. These algorithms could be trained to predict what posts a Facebook user would like to see on their personal news feed. This, of course, is not unlike the similar "neural networking" AI functionality incorporated into Google/YouTube in the years leading up to Roof's massacre detailed above.

206.    Quinonero developed a new model-development platform called FDLearner Flow which allowed for the expansion of algorithms that would psychologically hook users. Algorithms

were enabled to analyze every user interaction, to create faster more personalized feedback loops with the assistance of AI, and to even better tailor the user's News Feed to promote engagement.

207. Facebook researchers also found that users with a tendency to post or engage with melancholy content could easily spiral into consuming increasingly negative material that risked further worsening their mental health.

208. Facebook was founded in 2004 by Mark Zuckerberg and rapidly became the number one online social media platform in the world. It includes four critical platforms: Facebook, Instagram, Messenger and WhatsApp. These platforms are used by 3.59 billion people every month. Meta had total revenues of $118 billion dollars in 2021, an increase of 66% from just two years earlier. Meta has a market capitalization of $364 billion dollars and is regarded as one of the top five companies in market capitalization in the world. Meta has previously disclosed it "generates substantially all of [its] revenues from advertising" (Meta Platforms, Inc. *Form 10-K* at p. 15 (Jan. 28, 2022)). The Company must maintain and grow its user base and keep those users engaged to continue to generate these levels of advertising revenue. Facebook has repeatedly rejected fixes to its algorithm meant to curb such things as proliferation and exacerbation of hate and extremism because of concerns those fixes would reduce user traffic and thus reduce revenue. Facebook has declined to "trade off" traffic to improve the Platform's social and economic impact. Whistleblower Frances Haugen stated Meta's algorithm optimizes for content that generates engagement, including more content that is angry, divisive, and polarizing, because "they'll get more views." Ms. Haugen reported "Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click less ads, [and] they'll make less money."

209. Social media has been a welcoming place for racist influencers whose mission is to reestablish white supremacy through the use of hate speech, microaggressions, coordinated

harassment, and weaponization of emojis, GIFS and memes. Social media has the power to connect people who were once loners with their ideological partners, and it speeds how quickly white supremacist ideology can spread, thus encouraging and emboldening copycats. Roof was only 21 when he announced to attendees of a Bible study that he was there "to kill black people" and fatally wounded nine people at Mother Emanuel AME Church in Charleston, South Carolina in 2015. Patrick Wood Crusius, a 21-year-old from Allen, Texas, drove 650 miles to an El Paso Walmart, where he killed 23 people and injured 23 others. He set out to kill Mexicans because he claimed they were invading America.

210.    Again, Roof began the radicalization process performing a Google search for "black on white crime" which took him to the website of a South Carolina-based hate group named the Council of Conservative Citizens (formerly the White Citizens' Council). Roof wrote a manifesto that was heavy in white supremacist lies and mischaracterization of African Americans in the U.S. Significant time and significant additional consumption of materials fed to him on the internet, from sources – upon information and belief – including Facebook and Google/YouTube, occurred between the time of that initial 2012 Google search and Roof's decision to commit a racial massacre in 2015. And notably, Roof's Facebook profile photo he posted in the months just prior to the murderous massacre in Charleston was thick with symbolism. The photo shows Roof with the scowling face of an angry white man and wearing a jacket adorned with two flags: one from apartheid-era South Africa and the other from white-ruled Rhodesia (now Zimbabwe). These are symbols that have been adopted by modern-day white supremacy groups. He did not go straight from his Google search to committing mass murder. Years of grooming, exactly as per the intent and purpose behind the design of these products, moved him further and further down the path of extremism and, ultimately, to harmful (but profit-driving) behavior (in his case, violence).

211. The growth and influence of white supremacy groups on social media platforms like Facebook shows the dangers of allowing hate groups and racism to go unchecked. The ability to reach disillusioned young white males and fill their heads with racist hate while using social media platforms like Facebook (and Google/YouTube) as a sort of Trojan horse to psychologically alter the mindset of these vulnerable young men has allowed a proliferation of racial animosity and hate that has caused significant harm to minorities and especially to blacks in the United States. Facebook will argue Roof did not spend that much time on Facebook and was not particularly active with posting. They fail to understand (or feign ignorance) that the time spent on Facebook served as an affirmation of beliefs and thoughts that first entered Roof's mind *via* a Google search for "black on white crime." The proliferation of racially based hate on Facebook, which was accelerated by the Russian Defendant's social media campaign, created the environment that nurtured, encouraged and ultimately served to solidify and affirm the violent white supremacist rhetoric found in Roof's manifesto.

212. Ultimately, the question the jury will have to answer is whether Facebook (and Google/YouTube) should be held accountable for creating an algorithm that fed increasingly violent and provocative content to users with the intent to psychologically influence those users to spend more time engaged with Facebook for the purpose of increasing ad revenue. The jury will also have to decide whether these companies should be liable for their leadership's decisions (whether they sought to increase or decrease the risk of violence and violations of the civil rights of African Americans or simply ignored the problem) once leadership was alerted to the potential negative effects of proliferating hate against African American communities and other minorities caused and/or contributed to by their defective algorithms.

### C.  The Damage and Harm to Plaintiff Minor Person K.M.

213.    When the attack on the Rev. Pinckney and the other parishioners began, K.M. was sitting at a table a couple of tables down from the Rev. Pinckney in the main hall. She was sitting with her grandmother, Felicia Sanders, and her late uncle, Tywanza Sanders, when the shooting and killing began. Ms. Sanders pushed her granddaughter to the ground under the table and then laid on top of her to shield her young body from harm. They were able to hear over seventy gun shots along with the anguished screams of the victims. K.M. heard the violence and mayhem and saw and felt her grandmother's fear. K.M. heard and saw Roof approach the table she was under and heard him shoot her uncle. She felt her grandmother act like she was dead. She heard Roof then walk on to the next table. During this entire time, Plaintiff K.M. reasonably feared for her physical safety. While trapped under her grandmother's body and under the table, K.M. feared for her life and for the lives of her grandmother and uncle and worried she might never see her family again.

214.    K.M. was the youngest "in-room" survivor on June 17, 2015. She was only eleven years old at the time. Of all the surviving victims, she has been the most affected.

215.    She was living with her grandparents, Felicia and Tyrone Sanders, at the time and was per her teacher, speaking on behalf of the teaching staff at K.M.'s school as a whole, "an excellent student." She earned above average grades, participated in extracurricular activities, and had an excellent attendance record without any disciplinary issues.

216.    K.M. was also a regular attendee and enthusiastic participant in many of the religious services and communal activities at Emanuel AME. She was an eighth-generation member of the congregation.

217.    On June 17, 2015, K.M. attended the fateful Bible Study with her grandmother, uncle and great-aunt Susie. As detailed above, held tightly underneath a table by her grandmother, playing dead, K.M. survived the horrific mass shooting. But she was far from unharmed.

218.    In July 2015, K.M. began trauma-focused treatment at a University-based Crime Victim Center. Her treatment there lasted until April 2017.

219.    During the time of this treatment, K.M.'s therapist also referred her for art therapy treatment that took place in conjunction with her care at the USC Crime Victim Center, beginning in October 2015 and continuing until April 2016. In the therapy notes created by her art therapist, K.M. was noted as having nightmares, being sad and scared, missing her Uncle Tywanza and Aunt Susie, being afraid to shower, being angry, having flashbacks, being tearful, having a startle response to loud noises, being anxious and as having regressed from a mental-health standpoint.

220.    Due to continued worry and concern regarding K.M.'s mental health, her grandmother had her see yet another therapist. This treatment began in December 2016, while she was still being treated at the Victim Crime Center, and continued until September 2018. The notes from this treatment are particularly saddening and troubling:

- July 17, 2017: "[K.M.] linked into deep sadness and feelings that her family will never recover."

- July 24, 2017: "[K.M.] was able to access sadness when stating that her family 'is broken' and she'll never be able to say goodbye to her loved ones."

- May 26, 2018: "[K.M.] had difficulty imagining a positive future"; "[she] seems to have lost hopes for a happy, successful future since the shooting."

- July 3, 2018: "[K.M.] linked into deep sadness and shock, no anger. She accessed [sic] horrific scenes of the shooting, and was able to verbalize the events that followed."

- July 12, 2018: "[K.M.] accessed [sic] hurt and shock that 'anyone could do that' but not anger. She said she wished she'd died instead of her uncle."

221.     K.M.'s school at the time of the shooting only went through the sixth grade, so after graduation, she enrolled in a new school to begin the seventh grade. She completed the seventh grade, but began having significant difficulty, stemming from the harm suffered and described herein, once she began eighth grade at her new school.

222.     The first semester of K.M.'s eighth-grade year was not going well and some of the behaviors K.M. had been exhibiting were occurring at school. She was having a difficult time academically and a private tutor had to be hired to assist her with her school work. By the end of the semester, her school suggested she attend a different school for the second half of her eighth-grade year, which she did and she was able to complete the eighth grade.

223.     K.M. remained at her new school for the start of her ninth-grade year, but her behavior continued to deteriorate, so her grandmother, Felicia, on suggestion from K.M.'s school, began looking for an in-patient treatment facility that could address both K.M.'s therapeutic and educational needs.

224.     K.M.'s behavioral problems, were ongoing including hoarding, kleptomania and lying, and continued at her new school. As her grades began to deteriorate, as noted, her school recommended she be placed in a therapeutic boarding school.

225.     Growing ever more concerned, K.M.'s grandmother Felicia, who had a close relationship with a former Charleston Police Department officer asked her friend for assistance – specifically, she asked for suggestions of care-givers who might be able to help K.M.. The officer-friend of Felicia's referred her to another therapist at yet another facility, where K.M. began out-patient treatment in July 2018.

226.     The new therapist determined from the outset K.M. would need twelve weeks of intensive psychiatric treatment. The therapist noted the fact that K.M. had not talked about the

shooting. K.M.'s treatment with this therapist ended in April 2019 when K.M. was placed in an in-patient facility. She had to go all the way to Texas to receive the treatment she needed.

227.    She was first evaluated in Texas in March of 2019 and the physician who evaluated her found she suffered from "severe, chronic, complex PTSD" and recommended she be placed in an in-patient, residential treatment facility. The physician further noted:

> Unlike adults, it is not uncommon for adolescents who have experienced severe trauma to require phases of treatment over the course of their development, with these types of treatment varying in intensity and duration. As she ages, she will benefit from periodically revisiting psychotherapy as this events' influence on her unfolds over time.

228.    K.M. remained at the school in which she was enrolled until space became available at the specialized in-patient facility, where she began in April 2019. She remained there until August 2019, received psychiatric treatment, and completed her ninth-grade school year.

229.    K.M. was then able to return to Charleston and resume living with her grandparents. She was enrolled in yet another new school to begin the fall semester of her tenth-grade year in August 2019, but was able to remain there only until September 2019 due to her destructive behaviors continuing.

230.    Options running thin, K.M. next went to live with her biological mother in another locality in South Carolina. She was enrolled in public high school there in September 2019, but this was also short-lived as she was there only until November 2019.

231.    Moreover, in September 2019, K.M. attempted suicide and was taken to an emergency room. That hospital recommended she continue psychiatric treatment and she did.

232.    With her past medical history now including "suicidal," K.M. began treatment with her new psychiatrist in late November 2019. Her new treating psychiatrist also noted "[K.M. had] developed impulsive behaviors including self-mutilation." She further described K.M. as having

"low mood, guilt, sadness, helplessness, hopelessness, racing thought, flashbacks, hypervigilance and anger outbursts." She also referenced that Felicia was trying to get K.M. into yet another in-patient therapeutic/educational institution. Doing everything she could for her granddaughter, Felicia also had K.M. seeing a therapist for counseling at this time as well.

233.    K.M. was admitted to the new school/facility in December 2019 and it was noted in her intake paperwork: "[K.M.] reported more problems than are typically reported for girls aged 15, particularly problems of Anxious/Depressed, Thought Problems, Attention Problems, Rule-Breaking Behavior and Aggressive Behavior nature." The report further stated there were indications K.M. may meet the diagnostic criteria for "Depressive Problem, Oppositional Defiant Problem and Conduct Problem." And the facility's initial treatment plan of December 2019 lists K.M.'s preliminary diagnoses as ADHD and PTSD and that she would remain at the facility until completing the tenth grade. She was ultimately released in December 2020.

234.    K.M. has since returned to Charleston where she finished high school and is currently a full time student at a higher educational facility. She continues to receive receive therapy and care, and multiple medical assessments have determined the events of June 17, 2015 will have a life-long negative impact on her mental and emotional well-being.

## CAUSES OF ACTION

## COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT

(Against the Social Media Defendants)

235.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

236.    the Social Media Defendants make their social media (and search engine) products widely available to users around the world.

237.    Facebook and YouTube designed their systems and those systems' underlying algorithms in a manner that rewarded users for posting, and thereby encouraged and trained them

to post, increasingly extreme and outrageous hate speech, misinformation, and conspiracy theories attacking particular groups. Likewise, these products were designed to addict and influence the behavior of individuals like Roof by pushing them down rabbit holes just like what is described hereinabove. Google, likewise and upon information and belief, designed its product in such a way that it identified and provided to Roof top search hits Google believed he was looking for and would drive negative emotional response in him (specifically, the Council of Conservative Citizens' page and its ilk).

238.    The design of the Social Media Defendants' algorithms and products resulted in the proliferation and intensification of hate speech, misinformation, and conspiracy theories against African Americans in the United States, radicalizing users, and caused injury to Plaintiff.

239.    Through the design of their algorithms and products, these Defendants (1) contributed to the development and creation of such hate speech and misinformation and (2) radicalized users, causing them to tolerate, support, and even carry out offline racial violence.

240.    Facebook and Google/YouTube were repeatedly warned that hate speech and misinformation on their products, and in the manner it was delivered to users to drive engagement, was likely to result in offline violence.

241.    Facebook and Google/YouTube knew and had reason to expect that the level of white supremacist propaganda directed to its users, including those like Roof, would motivate some users like Roof to commit violence and thereby result in offline violence.

242.    Moreover, the kind of harm resulting from the offline violence committed by Roof (and so many others) is precisely the kind of harm that could have been reasonably expected from Facebook's and Google/YouTube's propagation and prioritization of engagement with white

supremacist propaganda and hate speech and misinformation on its system—e.g., homicide, wrongful death, personal injury, pain and suffering, emotional distress, and property loss.

243. The dangers inherent in the design of these product outweigh the benefits, if any, afforded by the design. Moreover, alternative design capabilities were well within the Social Media Defendants' grasp. *E.g.*, as affirmed by its former Director of Monetization, Tim Kendall, who described the algorithms' ability to cause emotional contagion as a simple matter of dialing up or dialing down the type of emotional response you wanted to produce as if this was as simple as turning up or down the volume on a stereo.[66] Same, of course, can be said of YouTube which utilized a very similar "feed" (as well as "autoplay" feature) to induce flow-state use of its product and "UpNext" algorithmic capabilities designed to individually-tailor content delivery/suggestion to users as precisely as possible, and according to learned knowledge about what would drive the most engagement-inducing response out of each particular user, regardless of the harm such repetitive and progressive content-delivery and engagement-inducement could foreseeably cause.

244. The products, as designed, were in a defective condition unreasonably dangerous to the users when said products left the control of the defendant and the defects caused and/or substantially contributed to Plaintiff's injuries, as set forth herein.

245. A manufacturer of a product made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom that manufacturer should expect to use the product or to be endangered by its probable and foreseeable real-world

---

[66] This statement by Tim Kendall, along with many other terrifying accounts from other former industry insiders and whistleblowers regarding the harms of social media and how they are a direct result of design decisions made by social media entities to drive profits, can be found in the acclaimed 2020 Netflix documentary, "The Social Dilemma."

harm potential caused by said manufacturer's failure to exercise reasonable care in the adoption of a safe plan or design.

246.    The Reverend Pinckney and others are dead, and Plaintiff K.M. witnessed the shooting and killing of nine people, including her uncle and her grandmother's close friend.

247.    Plaintiff K.M. sustained physical injuries and endured, and will in the future endure, pain and suffering, mental shock, emotional trauma, mental anguish, and other injuries.

248.    Due to this event, Plaintiff K.M. has suffered permanent disability and will be required to expend sums of monies for treatment in addition to suffering a loss of enjoyment of life, deprived of the love and companionship of her uncle, and otherwise damaged.

249.    As a direct, proximate, and foreseeable result of the negligent, careless, grossly negligent, and reckless, knowing and/or intentional acts of the Defendants set out above, the Rev. Pinckney and others are dead, and Plaintiff K.M.  has suffered severe and permanent injury.

250.    As a result of the emotional distress caused by witnessing the murder of her uncle and being in the zone of danger of the horrific massacre herself, K.M. suffered physical symptoms capable of objective diagnosis.

251.    K.M. has also suffered severe and permanent injury as a result of the Defendant's (and/or their/its divisions, agents, and/or employees) negligent infliction of emotional distress for which, Plaintiff, on behalf of K.M., is entitled to recover an amount of actual, special, and consequential damages to be determined by a jury at the trial of this action.

### COUNT II – NEGLIGENCE – DESIGN

(Against the Social Media Defendants)

252.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

253.    Again, the products at issue, as designed, were in in a defective condition unreasonably dangerous to the user when they left the control of the defendant and the defects caused and/or substantially contributed to Plaintiff's injuries, as set forth herein.

254.    A manufacturer of a product made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom the manufacturer should expect to use the product or to be endangered by its probable and foreseeable real-world harm potential caused by said manufacturer's failure to exercise reasonable care in the adoption of a safe plan or design. As noted throughout this Complaint, the Social Media Defendants' conduct in the design of their platforms/products was at the very least negligent, though there is ample evidence their conduct was knowing, reckless and/or purposeful at worst.

255.    As a direct, proximate, and foreseeable result of the negligence, carelessness, gross negligence, recklessness, intentional/purposeful conduct and/or departures from duties by Defendant as noted above, K.M. has suffered harms and losses.

256.    K.M.'s harms and losses, suffered due to the close proximity to the shooting, to being in the zone of danger and placed in fear of her own life, as well as to witnessing of mass murder including the killing of her uncle Tywanza and others, include, but are not limited to:

a.    personal injury;

b.    pain and suffering;

c.    mental anguish;

d.    loss of enjoyment of life;

e.    medical expenses;

f.    permanent impairment;

g.    lost wages; and

h.  loss of earnings capacity

257.    Due to the foregoing, Plaintiff is entitled to recover actual, special, and consequential damages in an amount to be determined by a jury at the trial of this action.

258.    WHEREFORE, Plaintiff respectfully prays for judgment against Defendants for all actual and compensatory damages for each specific occurrence of negligence pled in this Complaint to be determined by the jury at the trial of this action, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

## COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against the Social Media Defendants)

259.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

260.    The product, as designed, was in in a defective condition unreasonably dangerous to the user when it left the control of the defendant and the defect caused Plaintiff's injuries, as set forth herein.

261.    A manufacturer of a product made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom the manufacturer should expect to use the product or to be endangered by its probable and foreseeable real-world harm potential caused by said manufacturer's failure to exercise reasonable care in the adoption of a safe plan or design. As noted throughout this Complaint, the Social Media Defendants' conduct in the design of their platforms/products was at the very least negligent, though there is ample evidence their conduct was knowing, reckless and/or purposeful at worst.

262.    As a direct, proximate, and foreseeable result of the negligence, carelessness, gross negligence, recklessness, intentional/purposeful conduct and/or departures from duties by Defendants as noted above, K.M. has suffered harms and losses.

263.     The negligence of the Defendants was a substantial factor in radicalizing Roof, contributing to the mass violence he carried out. The negligence of the Defendants actually and proximately caused and/or was a substantial factor in causing Reverend Pinckney's death.

264.     Plaintiff K.M.., was in close proximity to her uncle when he was murdered in cold blood by Roof and feared for her life and the life of her grandmother.

265.     Plaintiff K.M.,  saw the murder of Reverend Pinckney and others.

266.     Plaintiff K.M. heard the hate come from Roof's mouth and understood that the killing was racially motivated.

267.     Plaintiff K.M. has suffered severe emotional distress which has manifested itself by physical symptoms capable of objective diagnosis that can be established by expert testimony.

268.     WHEREFORE, Plaintiff respectfully prays for judgment against Defendants for all actual and compensatory damages for each specific occurrence of negligence pled in this Complaint to be determined by the jury at the trial of this action, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

## COUNT IV – CIVIL CONSPIRACY IN VIOLATION OF THE KU KLUX KLAN ACT

(Against All Defendants)

269.     Plaintiff incorporates herein by reference the allegations contained in all proceeding paragraphs.

270.     Under the Ku Klux Klan Act, 42 U.S.C. § 1985(3) *et seq.*, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

271.    Here the Russian Defendants plotted, coordinated, and executed a common plan through and/or with social media platforms, most notably those of the Meta Defendants, to cause racial unrest and to promote violence in the United States.

272.    In furtherance of this conspiracy, the Meta Defendants, through the use of defective algorithms, added in a material way to the psychological messaging and effect of the hate and racism and violence promoted by the Russian Defendants. Upon information and belief, the Meta Defendants participated in the conspiracy insofar as they had direct knowledge of and/or wilfully blinded themselves to clear evidence of rampant and fraudulent misuse of their products by Russian and other foreign actors for the purpose interfering in U.S. elections, including interfering with the right of African Americans to vote and/or otherwise depriving African Americans of their civil rights.

273.    The Meta Defendants conspired with the Russian Defendants to deprive African Americans of their fundamental right to vote and equal protections of the law, knowingly and recklessly producing racial animus, distrust, and hate. The Russian Defendants worked together to use Facebook's algorithms to proliferate race-based hate and amplify lies promoting violence against African Americans and discouraging them from voting.

274.    The Google Defendants, in turn, conspired with the Meta Defendants through data sharing regarding users to best optimize their own products' ability to addict their common users and best manipulate their thinking and behavior. Both the Google and the Meta Defendants did so to drive engagement (and, therefore, profit), but the fact that they participated in the strategy/plan of stoking racial animus for profit, rather than for the same reason(s) as the Russian Defendants, is no bar to civil conspiracy claims of the type alleged here. Nor do all of the members of the conspiracy need to be aware of all other involved members, the full extent of the conspiracy, or all

involved actions of other co-conspirators under South Carolina law and other federal jurisprudence regarding the KKK Act civil remedies provisions. They need only share the same invidiously and racially discriminatory objective (not purpose) and act in furtherance thereof.

275.   What we know at this point is that the Google and Meta Defendants conspired with one another to drive engagement, and acted in furtherance thereof in part, by driving racial hate and animus in certain users through shared mined data. Upon information and belief, the Meta Defendants in turn conspired with the Russian Defendants for purposes of the same invidiously and racially discriminatory objective and acted in furtherance thereof by continuing to sell advertisements to accounts it knew to be inauthentic, of Russian origin and linked to Russian political influence campaigning.

276.   The activities alleged above were undertaken with purpose by all the Russian Defendants as co-conspirators for the purpose of causing racial unrest and violence in the United States, including the very kind of offline violence carried out by lone wolves like Roof.

277.   The Conspirators carried out a clandestine operation for the purpose of depriving, either directly or indirectly, African Americans of the equal protection of the laws, or of equal privileges and immunities under the laws.

278.   The Conspirators carried out acts in furtherance of the conspiracy to deprive African Americans of the rights or privileges and immunities, including but not limited to:

   a.   Purchasing advertising space on Facebook to disseminate white supremacist propaganda, ideology, and hate speech and discourage African Americans from voting (Russian and Meta Defendants)

   b.   Designing social media products to maximize user engagement and prioritize profits over safety even in cases of unprotected hate speech and propaganda (Meta and Google Defendants)

   c.   Creating and allowing fictitious social media accounts to stoke racial tensions and disseminate white supremacist propaganda, ideology, and hate speech (Russian & Meta Defendants)

d.  Breaching the state election infrastructure in at least 39 states in America and using voter data to target African Americans and discourage them from voting (Russian Defendants)

e.  Hacking state election boards, the DNC, the RNC, secretaries of several states, and the 2016 Clinton campaign, including data analytics and voter-turnout models to target African Americans with false and misleading information, wrongfully interfering with their right to vote (Russian Defendants)

f.  Using stolen voter data to bombard African Americans with negative information about exercising their right to vote (Russian Defendants)

g.  Attempting to suppress African American votes and cause racial discord by engaging minority groups and others on social media in a manner intended to deepen social and political divisions within the United States and negatively influence African American voter turnout (Russian Defendants)

h.  Creating at least 25 social media pages drawing at least 1.4 million followers to arouse the American political right and promote white supremacist ideology and propaganda, causing online radicalization (Russian and Meta Defendants)

i.  Creating false and misleading extremist content and/or spreading it on social media, including memes that exploited social attitudes about people of color and promoted white supremacist propaganda, including the white replacement theory (Russian, Meta and Google Defendants)

j.  Breaching state election infrastructure and scanning databases for vulnerabilities, attempted intrusions, and in some cases successfully penetrating voter registration databases. This activity was part of a larger campaign to prepare to undermine confidence in the voting process including decreasing African American turnout and increasing white conservative turnout. (Russian Defendants)

k.  Undertaking a wide variety of intelligence-related activities targeting the U.S. voting process. These activities began at least as early as 2014, continued through Election Day 2016, and included traditional information gathering efforts as well as operations meant to discredit the integrity of the U.S. voting process and election results. (Russian Defendants)

279.  The Reverend Pinckney and eight other parishioners are dead, and Plaintiff K.M. witnessed the shooting and killing of nine people, including the Reverend and her uncle, and was in the zone of danger of and feared for her own life during Roof's massacre as well.

280.  Plaintiff K.M. sustained physical injuries and endured, and will in the future endure, pain and suffering, mental shock, emotional trauma, mental anguish, and other injuries.

281.    Due to this event, Plaintiff K.M. has suffered permanent disability and will be required to expend sums of monies for treatment in addition to suffering a loss of enjoyment of life, deprived of the love and companionship of her uncle, and otherwise damaged.

282.    As a direct, proximate, and foreseeable result of the negligent, careless, grossly negligent, and reckless, knowing and/or intentional acts of the Defendants set out above, the Rev. Pinckney and eight others are dead, and Plaintiff K.M. has suffered severe and permanent injury.

283.    As a result of the emotional distress caused by witnessing the murder of her uncle and eight others and being placed in fear for her own life, K.M. suffered physical symptoms capable of objective diagnosis.

284.    K.M. has also suffered severe and permanent injury as a result of the Defendant's (and/or their its divisions, agents, and/or employees) negligent and/or intentional (in the case of the Russian Defendants) infliction of emotional distress for which, Plaintiff, on behalf of K.M. is entitled to recover an amount of actual, special, and consequential damages to be determined by a jury at the trial of this action.

## TIMELINESS & TOLLING

285.    Under South Carolina Code of Laws, Section 15-3-40(1), the personal injury claims of a minor are tolled until one year after the minor reaches age 18. Plaintiff K.M.. falls within this exception to the general statute of limitations as she has not reached the age of 19.

286.    Therefore, this action is timely under § 15-3-40(1).

## PRAYER FOR RELIEF

287.    Plaintiff prays for the following relief:

    a.    That process issue and the Defendants be served in accordance with the Federal Rules of Civil Procedure;

    b.    That Plaintiff be awarded compensatory damages, including medical expenses, subrogation expenses, lost wages, loss of earning capacity, loss of enjoyment of life, future economic damages, general noneconomic damages, pain and suffering, and for personal injury in an amount to be determined by the enlightened conscience of a jury;

    c.    That Plaintiff be allowed to amend this Complaint in accordance with the Federal Rules of Civil Procedure;

    d.    That the Plaintiff be awarded punitive damages;

    e.    That Plaintiff have a trial by jury as to all issues; and

    f.    That Plaintiff be awarded such other relief as this Court may deem just and proper.

Submitted:    April 5, 2023

s/ François M. Blaudeau

François M. Blaudeau (ASB-7722-D32F)
Evan T. Rosemore (ASB-3760-N10B)
Marc J. Mandich (ASB-9346-H48E)
SOUTHERN MED LAW
2762 B M Montgomery St, Suite 101
Homewood, AL 35209
Office: 205.564.2741
Fax: 205.649.6386
francois@southernmedlaw.com
evan@southernmedlaw.com
marc@southernmedlaw.com

*Lead Counsel for the Plaintiff*
*(pro hac vice applications to be filed)*

s/Gerald Malloy

Gerald Malloy
Malloy Law Firm
108 Cargill Way
Hartsville, SC 29550
gmalloy@bellsouth.net

*Co-Counsel for the Plaintiff*

s/t. Ryan Langley

Ryan Langley 10047
Hodge & Langley Law Firm, P.C.
229 Magnolia St.
Spartanburg, SC 29306
rlangley@hodgelawfirm.com

*Co-Counsel for the Plaintiff*

s/Andrew J. Savage III
Andrew J. Savage III (3734)
SAVAGE LAW FIRM
15 Prioleau Street
Charleston, SC 29401
Telephone: (843) 720-7470
Andy@savlaw.com